No. 86-463

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

THOMAS A. WEINBERG and CAROLYN
WEINBERG, husband and wife,

        Plaintiffs and Respondents,

-vs-

FARMERS STATE BANK OF WORDEN,
MONTANA,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert Holmstrom, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        William Conklin argued, Conklin, Nybo & LeVeque,
Great Falls, Montana
Pierre L. Bacheller, Inc., Billings, Montana

    For Respondent:

        Michael J. Whalen argued, Whalen & Whalen, Billings,
Montana

    For Amicus Curiae:

        Moulton Law Firm; Sidney R. Thomas argued for First
Security Bank-Livingston, Billings, Montana

---

        Submitted:    January 12, 1988

        Decided:    March 2, 1988

Filed:  MAR 3 - 1988

_Ethel M. Harrison_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.


Farmers State Bank of Worden appeals from a judgment founded on a jury verdict in the District Court, Thirteenth Judicial District, Yellowstone County, awarding in favor of the Weinbergs compensatory damages in the amount of $104,790.75 and punitive damages of $100,000.00.

The Weinbergs have cross-appealed from the decision of the court awarding $12,500.00 in attorney fees, which the Weinbergs claim is inadequate.

We affirm the judgment against the Bank, and also affirm the award of attorney fees allowed by the District Court, but remand for an award of further attorney fees on appeal.

### Bank's Appeal

Bank's Issues (Restated)

I. The District Court's special verdict form:

a. Adopted plaintiffs' view of disputed factual issues;

b. Concentrated on contract damages, and conflicted with instructions which related only to tort damages;

II. The evidence was insufficient to sustain the jury findings:

a. That the Bank breached its loan agreement;

b. That the Weinbergs were entitled to $104,790.00 in compensatory damages;

c. That the Bank breached an implied contract of good faith and fair dealing;

d. That any actual damages underlay the award of punitive damages;

e. That punitive damages were proper, and not the result of passion and prejudice.

## Facts

In reviewing a jury verdict, our function is to determine whether substantial credible evidence in the record supports the jury verdict. We must view the evidence in the light most favorable to the prevailing party below, and if the record presents conflicting evidence which has been resolved by the jury, this Court is precluded from disturbing the verdict. Anaconda Company v. Whittaker (1980), 188 Mont. 66, 610 P.2d 1177. When the evidence is in conflict, we can only review testimony for the purpose of determining whether there is any substantial evidence in the record to support the verdict of the jury, and we must accept evidence there found as true, unless the evidence is so inherently impossible or improbable as not to be entitled to belief. Strong v. Williams (1969), 154 Mont. 65, 460 P.2d 90.

The Weinbergs began their farming career in the Bighorn River valley north of Hardin, Montana. Their operations were financed by the Production Credit Association (PCA) on notes that were endorsed by Weinberg's father. As their financial condition improved, they moved to a larger farm in the Yellowstone River valley, near Custer, Montana, in 1964. There they leased, on a crop share basis, a 2,200 acre farm consisting of 540 acres of irrigated land, 200 acres of dryland farmland, and the rest grazing land. In 1968, the Weinbergs began to finance with the Farmers Home Administration (FmHA) where their notes were not required to be co-endorsed. They operated on a direct farm operational loan from the FmHA until the FmHA felt they had sufficient collateral to obtain financing in the private market. At that point they began financing with the defendant, Farmers State Bank of Worden (Bank).

When the Weinbergs began doing business with the Bank, they owed virtually no money. They had a small herd of cattle and enough farm machinery to operate at the time.

In their farm operation near Custer, the Weinbergs raised more feed than they could use on the farm with their small herd of about 30 cows, a bull and a milk cow or two. They had discussions with Bud Lawrence of the Bank, who counseled them that they ought to expand their herd of cattle to use up the extra feed. The expanded operation would require an additional place in which to run the cattle. Accordingly, the Weinbergs made arrangements to lease a place near Bighorn for an expanded herd. On that basis, in 1974, the Bank advanced enough additional monies to expand the herd by 90 cows. The Bank had promised to advance the money necessary for the herd expansion.

The expanded operation was decidedly more expensive. The place that they rented for grass was 90 miles from the Custer operation and required trucking of cattle back and forth as the seasons demanded. There were veterinary bills, additional taxes, and the necessity to hire part-time help for the cattle. In the meantime, in 1974 and 1975, cattle prices dropped drastically. In the fall of 1975, the Weinbergs found themselves owing approximately $90,000.00.

In the fall of 1975, the Bank officers notified the Weinbergs that the Bank could no longer provide operating monies to the Weinbergs unless a guaranty of their debt from the FmHA could be obtained.

Accordingly, application was made to the FmHA for a Contract of Guarantee under the Emergency Livestock Credit Act of 1974 as amended. As part of the application, the Bank certified that it was unwilling to extend a line of credit to Weinbergs without the guaranty and that it would not refinance the existing loan balance without the guaranty.

- 4 -

The Weinbergs signed the application, certifying that the statements of the Bank were true and also signed and submitted a separate application for the loan guaranty revealing their financial condition to show the necessity for the loan guaranty. On December 23, 1975, the FmHA issued its Contract of Guarantee to the Farmers State Bank of Worden, which guaranteed a line of credit up to a ceiling of $137,533.40 on loans made to Thomas A. Weinberg. The guaranty was for 90 percent of the difference owed on the total amount of principal and interest on any emergency livestock loan advances made within the line of credit ceiling and the value of any collateral or loan security at the time of any foreclosure, unless sooner paid.

As part of the loan guaranty procedure, the Weinbergs had each signed a promissory note which was submitted as a part of the application. The note was dated November 14, 1975, due seven years later on November 14, 1982, for a face amount of $137,533.40, with an annual interest rate of 9.5 percent. (There were some additional finance charges unimportant here.)

It was the contention of the Weinbergs that by the execution of the applications for the loan guaranty, the November 14, 1975 note, and the issuance of the loan guaranty, the Weinbergs and the Bank had agreed that for a period of seven years the Bank would extend to the Weinbergs loan advances on their cattle operation up to a ceiling limit of the face amount of the note at an annual rate of 9.5 percent. Any amounts advanced by the Bank over and above the face amount of the note would be subject to the prevailing rates of interest charged by the Bank at the time the additional loans were made.

The face amount of the November 14, 1975 note included about $93,000.00 for the refinancing of the existing

indebtedness of the Weinbergs to the Bank, and a proposed amount of approximately $44,000.00 to be used for operational monies in the coming year. In connection with the loan, the Bank set up an escrow savings account into which all the monies received as income in 1976 from the farming operations of the Weinbergs were deposited, there to gain interest at approximately 5 percent per year. At the end of the year, the monies from the escrow account would be taken and applied on the indebtedness of the note.

In the fall of 1976, the Weinbergs had further discussions with officers of the Bank. They were told that the FmHA no longer required an escrow account to be kept and that it would be to the advantage of the Weinbergs to drop the escrow account, since thereafter, income received from farm operations would be applied directly to reduce the face amount of the loans outstanding. Thus, the monies, instead of lying in an escrow account at 5 percent, would be used to reduce the Weinberg indebtedness and so reduce the indebtedness which accrued interest at 9.5 percent. The Weinbergs were told, however, that in order to achieve this result, it would be necessary for them to sign a new note, a note they did sign on December 30, 1976, still in the face amount of $137,533.40, with interest at the rate of 9.5 percent but payable in one year, December 30, 1977. Thereafter, on each succeeding year, the Weinbergs signed successive notes as advances were made by the Bank and income was applied to the outstanding debt. However, in 1979 and 1980, interest rates had substantially increased and the successive notes signed by the Weinbergs were at rates of interest in excess of 9.5 percent, sometimes as high as 18 percent per year. The first interest rate increase occurred on April 3, 1979, when the Weinbergs were charged 11 percent.

In the Contract of Guarantee, issued by the FmHA, there is no specific date set for the expiration of the guaranty. All parties, and the FmHA, agree that the guaranty expired in the fall of 1982. The expiration date could only be gathered from the original note of November 14, 1975, which provided for a term of seven years. When the guaranty expired in the fall of 1982, the Bank notified the Weinbergs that it was unwilling to refinance the debt or to provide further operational monies. FmHA had indicated it would extend the guaranty for an additional ten years but on terms which were apparently unacceptable to the Bank. The Bank, therefore, required eventual liquidation of the collateral under the notes, which resulted in the sale of the entire Weinberg herd, some crops, and their farm machinery. More of the facts relating to the post-liquidation situation will be recited in connection with our discussion hereunder on the sufficiency of evidence.

The above facts are stated from the viewpoint of the Weinbergs, since the jury found in accordance with their view. It should be noted that the Bank contends that it did not counsel the Weinbergs to expand their cattle herd; that the Weinbergs agreed to the execution of the second note in December, 1976, which modified their agreement; and the Weinbergs agreed to the payment of interest rates over and above the 9.5 percent by signing subsequent notes.

The Special Verdict Form

Two issues are raised by the Bank relating to the special verdict form submitted to the jury. The first is that in paragraph A-1 of the special verdict form, the District Court improperly decided disputed issues against the Bank.

The record here shows that following the settlement of instructions in the District Court, a form of special verdict

containing interrogatories for the jury to answer was examined by counsel for the parties and agreed upon without objection. Sometime after the cause had been submitted to the jury (the court gave the case to the jury at 2:18 p.m. and reconvened at chambers at 3:10 p.m.), the court summoned counsel and informed them that he had prepared a different special verdict form from the one that had earlier been agreed upon. The District Court asked if either counsel had any objection to the new special verdict form. Both counsel responded, "no objection, your honor."

The court recessed at 3:15 p.m. and the new special verdict form was presumably delivered to the jury. The jury returned its verdict at 8:17 p.m. that day. No record has been preserved in this case of the original special verdict form.

The first interrogatory to the jury contained in the special verdict form, and the jury's response thereto follows:

> A-1. Was the November 14, 1975 contract between the parties modified on December 30, 1976 so as to relieve the Bank from the obligation of loaning One Hundred Thirty Seven Thousand Five Hundred Thirty-three and 40/100 Dollars ($137,533.40) to the Weinbergs for seven (7) years with interest at the rate of nine and one-half percent (9½%) per annum payable semi-annually.
>
> YES_____ NO____x____

The Bank contends that the first issue it raised in the pretrial order of the court was that the Bank had no obligation to furnish the plaintiffs a line of credit in the amount of $137,533.40 at an interest rate of 9.5 percent per annum for a period of seven years. The Bank contends that the wording of paragraph A-1 of the special verdict form took

that issue of fact away from the jury because the court assumed there was in fact such an obligation.

Two great rules of appellate review militate against the position of the Bank on this issue. First, no objection was raised to the special verdict form before its submission to the jury, and secondly, this Court will not review an issue raised for the first time on appeal. Rozell Corp. v. Dept. of Public Service Regulation, et al. (Mont. 1987), 735 P.2d 282, 44 St.Rep. 618; Bowman v. Prater (Mont. 1984), 692 P.2d 9, 41 St.Rep. 2236; Akhtar v. VanDeWetering (1982), 197 Mont. 205, 642 P.2d 149; Peters v. Newkirk (1981), 633 P.2d 1210, 38 St.Rep. 1526. Here the issue of propriety of the special verdict was not raised by objection at the time of its presentation to counsel, nor subsequently, in a motion for new trial, after the verdict had been entered.

The Bank, however, argues that we should consider the issue under the plain error doctrine citing State Bank of Townsend v. Maryann's, Inc. (1983), 204 Mont. 21, 664 P.2d 295; and Halldorson v. Halldorson (1977), 175 Mont. 170, 573 P.2d 169. We will review the issue in this case, not because a plain error occurred (that is, an error which was fundamental, highly prejudicial and which affected the substantial rights of the parties) but rather because the contract issue is intertwined with the remaining issues in the cause from which it cannot be separated.

The main thrust of the Bank's argument on this issue is that the Contract of Guarantee was one exclusively between the Bank and the FmHA in which the Weinbergs had no part, and that the promissory note of November 14, 1975, executed before the Contract of Guarantee, was not in itself an obligation to extend a line of credit to the Weinbergs for a period of seven years.

The contention of the Bank is oppugnant to what occurred between the Bank and the Weinbergs following the Contract of Guarantee. While it is true that the Contract of Guarantee taken by its four corners, is simply an agreement to guarantee 90 percent of a line of credit and imposes no obligation on the Bank; and the promissory note was nearly completely performed by the Bank in that between November 14, 1975 and November 9, 1976, it had provided refinancing and advances in the sum of $137,288.00; it is also true that the Bank continued to make advances for operational monies to the Weinbergs (though the Bank contends it was under separate and other arrangements). The Bank did look in 1982 to the FmHA for the guaranty of the line of credit it had extended to the Weinbergs through the ensuing years.

The Weinbergs, of course, contended that the contract between them and the Bank was for a line of credit for operational money advances to be made to them by the Bank for the seven year period and that the Contract of Guarantee and the note of November 14, 1975, were simply written expressions of that agreement.

Moreover, the position of the Bank throughout the trial was that an agreement existed between the parties beginning November, 1975, which was modified a year later as evidenced by the note of December 30, 1976. The Bank itself offered an instruction which was given by the District Court to the jury as follows:

> Farmers State Bank contends that the only contract between the Bank and the Weinbergs were the promissory notes and security agreements executed from time to time, and while the November 14, 1975, note embodied the original terms of the agreement between the Weinbergs and the Bank, that contract was later modified on December 30, 1976. Farmers State Bank contends that Thomas and Carolyn Weinberg, on 12-30-76 signed a new promissory note in favor of Farmers State Bank in the face amount

of $137,533.40, with interest at the rate of 9½%
per annum and a maturity date of one year from the
date of making. Farmers State Bank contends that
this new contract governs the relationship with the
parties, and that there remains due and owing upon
the obligation evidenced by that 12-30-76 note, as
renewed annually by Thomas and Carolyn Weinberg,
the sum of $25,991.53.

In another instruction offered by the Bank and given to
the jury, it was stated:

In this case you are presented with the following
issues:

1. Did the Bank breach a contract under which the
Weinbergs were entitled to some benefit?

It is clear from the instructions offered by the Bank,
from the opening statement and final argument, that the
position of the Bank in this case during the trial was that
whatever agreement existed between the parties in 1975 was
modified in 1976 to a procedure where advances would be made
upon successive notes to be signed by the Weinbergs, all
subject to the Contract of Guarantee originally issued on the
first note of November 14, 1975.

Paragraph A-1 of the special verdict form submitted by
the District Court merely recited this position, and asked
the jury to determine whether a modification had occurred on
December 30, 1976.

Thus, in this case, our decisions in Northwestern
National Bank v. Weaver-Maxwell, Inc. (Mont. 1986), 729 P.2d
1258, 43 St.Rep. 1995; and Kinjerski v. Lamey (Mont. 1981),
635 P.2d 566, 38 St.Rep. 1703, are to be distinguished
because here paragraph A-1 of the special verdict was
designed for the jury to determine a factual issue essential
to judgment in this cause.

Conflict Between Special Verdict and the Instructions

In a second attack upon the special verdict form, the Bank contends the form was inherently contradictory with the instructions in allowing the jury to fix a verdict based on breach of contract when the court had instructed the jury on the tort measure of damages.

The full text of the special verdict form and the responses of the jury are set forth under footnote 1, infra. It will be seen from the responses that the jury determined that the November 14, 1975 contract had not been modified by the parties on December 30, 1976; and that the Bank had breached the November 14, 1975 contract, which resulted in damages of $104,709.75. The jury further found that the Bank breached an implied covenant of good faith and fair dealing. Because the jury awarded damages under the breach of contract claim, the special verdict form directed the jury not to fix damages for the breach of the implied covenant and directed the jury's attention instead to whether punitive damages should be awarded. The jury did fix punitive damages in the amount of $100,000.00.

In Montana, the measure of damages for a breach of contract is the compensatory amount for all the detriment proximately caused by or likely to result therefrom in the ordinary course of things. Damages for such breach must be clearly ascertainable both in nature and origin. Section 27-1-311, MCA. The measure of damages for a tort in Montana is the compensatory amount for all the detriment proximately caused by the tort "whether it could have been anticipated or not." Section 27-1-317, MCA. The Bank contends here that the measure of damages for a breach of contract is substantially narrower than the tort measure under the statutory definitions and that the failure of the District Court to instruct on the measure of damages for breach of contract was a serious fundamental error.

The anomaly in the Bank's position is that it offered instructions accepted by the District Court which instructed the jury that in a breach of contract case the amount of damages must be clearly ascertainable in nature and origin, and in instruction no. 34, embodied the statutory definition of the measure of damages for breach of contract. However, these instructions were withdrawn by the Bank in the course of settling the instructions.

The District Court did give the jury its instruction no. 21 which embodied the measure of damages for a tort. In its instruction no. 25, however, it warned the jury that damages for loss of profits should not be speculative. It further told the jury that no damages were recoverable which were not clearly ascertainable both in nature and origin and that only profits which are reasonably certain could be awarded.

The jury award of $104,790.75 can be mathematically determined from the transcript. The Weinbergs claimed the payment of excess interest over 9.5 percent of $33,158.17; loss of three years' cash crops $42,532.99; loss of 1985 barley crop $7,349.59; and loss of 3 years' hay production $21,750.00. Whether regarded from the viewpoint of damages for tort or for contract, the amount awarded by the jury would have been the same based on the claims of the Weinbergs. The District Court recognized this and arranged the special verdict forms so as not to allow the jury to bring in an award of double damages, one for breach of contract, and one for breach of the implied covenant of good faith and fair dealing. In any event, the damages would have been the same.

For three reasons, therefore, (1) the instructions on breach of contract damages were withdrawn by the Bank during the settlement instructions, (2) the instructions given by the court were substantially modified so as to include the

essential elements for breach of contract damages, and (3) no harm was done because the damages would be the same in any event, we find no merit in this issue raised by the Bank.[1]

---

[1] The full text of the special verdict form, with the jury responses, was as follows:

It is your task at this time to determine whether the Defendant, Farmers State Bank of Worden, is liable to the Plaintiffs, Thomas A. Weinberg and Carolyn Weinberg, husband and wife, and whether or not the Weinbergs are liable to the bank. To assist you in reaching your verdict, you must answer the following set of questions. Unless you are otherwise instructed, you must answer each of the following questions in accordance with the instructions you have received, regardless of your answer to the prior questions.

SECTION A.

A-1. Was the November 14, 1975, contract between the parties modified on December 30, 1976, so as to relieve the bank from the obligation of loaning One Hundred Thirty-seven Thousand Five Hundred Thirty-three and 40/100ths Dollars ($137,533.40) to the Weinbergs for seven (7) years with interest at the rate of nine and one-half percent (9½%), payable semi-annually?

YES _____ NO ___x___

If your answer to question A-1 above is "yes", do not answer the remaining questions in this Section A, but proceed to Section B. If your answer is "no", proceed to the next question.

A-2. Did the bank breach the November 14, 1975, contract?

YES ___x___ NO _____

If your answer to question A-2 is "no", do not answer any more questions in this Section but proceed to Section B. If your answer to question A-2 is "yes", you then must answer question A-3.

## SUFFICIENCY OF EVIDENCE ISSUES

Breach of the Loan Agreement

Bank contends that the evidence is insufficient to sustain the jury verdict that the Bank had breached a loan agreement with the Weinbergs.

---

A-3. Did the Weinbergs sustain damages as a result of the bank's breach of the November 14, 1975, contract?

YES ___x___ NO _____

If your answer to question A-3 is "no", do not answer any more questions in this Section but proceed to Section B. If your answer to question A-3 is "yes", you must then determine the amount of the damages sustained by the Weinbergs as a result of the bank's breach of the November 14, 1975 contract and insert the amount in the following blank. Damages for breach of November 14, 1975, contract - $104,790.75.

SECTION B.

B-1. Did the bank breach the implied covenant of good faith and fair dealing in its dealings with the Weinbergs?

YES ___x___ NO _____

If your answer to question B-1 is "no", answer no more questions in this Section but go to Section C. If your answer to question B-1 is "yes" and if you have awarded damages as part of your answer to question A-3, proceed to question B-2. If you have not awarded any damages in your answer to question A-3, then you must determine the amount of damages, if any, sustained by the Weinbergs as a result of the bank's breach of the implied covenant of good faith and fair dealing and insert the amount in the following blank. Damages for breach of the implied covenant of good faith and fair dealing - $_____.

B-2. Was the conduct of the bank in breaching the implied covenant of good faith and fair dealing fraudulent, malicious or oppressive?

- 15 -

Under this contention, Bank argues that the Contract of Guarantee was one between the Bank and the FmHA, and created no obligation on the part of the Bank to loan monies to the Weinbergs. The Bank points to cases holding that there is no privity, mutuality, or joint liability between the principal debtor and the guarantor, and again to cases holding liability to the guaranteed party is not subject to the defenses that may exist between the creditor and the debtor, and that the terms of the guaranty measure the liability of the guarantor, but do not constitute a contract between the

---

       YES ____x____    NO _____

If your answer to question B-2 is "no", do not answer any more questions in this Section but go to Section C. If your answer to question B-2 is "yes", you must then determine the amount, if any, of the punitive damages to which the Weinbergs are entitled to recover from the bank and insert said amount in the blank provided. Punitive damages - $100,000.00.

Section C.

C-1. Are the Plaintiffs, Thomas A. Weinberg and Carolyn Weinberg, indebted to the Defendant, Farmers State Bank of Worden, upon the promissory note?

       YES _____    NO ____x____

If your answer to question C-1 above is "no", do not answer any further questions in this Section. If your answer is "yes", you must then determine the amount owed by the Weinbergs to the bank and insert said amount in the blank provided. Amount of indebtedness to the bank - $_____.

The answers stated above are the verdict of the jury impaneled in this case.

Dated this 13 day of March, 1986.

                              /s/ Jesse Valdez
                                  Foreman

debtor and the creditor. It cites General Finance Company v. Powell (1943), 114 Mont. 473, 138 P.2d 255; Butte Machinery Co. v. Carbonate Hill Mining Company (1926), 75 Mont. 167, 242 P. 956; Baroch v. Greater Montana Oil Company (1924), 70 Mont. 93, 225 P. 800. In addition, the Bank contends that the Weinbergs may not base their claim of breach upon the promissory note executed November 14, 1975, because that note was validly replaced by a renewal note and subsequent renewal notes carrying maturity dates of one year or less.

Again, the Bank argues that the promissory note of November 14, 1975, does not create an obligation on the part of the Bank to do anything. Relying on the parol evidence rule, § 28-2-905, MCA, the Bank states that the writing on the note merely allows the plaintiffs to pay back the principal advances under the note over a period of seven years at 9.5 percent payable semi-annually.

Finally, the Bank contends that the promissory note of November 14, 1975, was replaced by the agreement of the parties with a promissory note of December 30, 1976; that the original note was stamped "paid" with the execution of the second note although the original note was kept in the Bank file and not returned to the borrowers. The Bank officers testified that the Weinbergs executed the replacement note and subsequent notes freely and voluntarily without coercion.

It is the Bank's position, therefore, that the Contract of Guarantee was between the Bank and FmHA, that the Weinbergs had no privity or mutuality in the Contract of Guarantee, and that the original note was modified a year later by and with the consent of the Weinbergs. The terms of

the writings determined the agreement between the parties and any other agreement is subject to the parol evidence rule.

At the close of Weinbergs case in chief, the Bank moved for a directed verdict on the ground that the Weinbergs had failed to carry their burden of proof which the court denied, saying:

> The court views the evidence at this point to be sufficient to support a jury verdict, here that there was a breach by the Bank of the agreement which the parties entered into wherein the Bank agreed to provide $137,533.40 for 7 years at $9\frac{1}{2}$%. That there is sufficient evidence upon which the jury can find, in breaching that, the Bank acted with malice, actual or constructive . . .

The Weinbergs respond to these contentions of the Bank, saying that they represent a change of position from that taken by the Bank at trial. The Weinbergs state that in the District Court, the Bank recognized it had an obligation to the Weinbergs to extend a line of credit subject to the Contract of Guarantee for the sums stated for a period of seven years at 9.5 percent. The Bank's further position at trial was that the obligation to extend such line of credit had been changed by the execution of the new note by the Weinbergs on December 30, 1976, together with an accompanying security agreement. The Bank's position of modification was evidenced, say the Weinbergs, by its contentions set forth in the pretrial order which include the following paragraph:

> That the November 14, 1975 note was paid by the Weinbergs, by their voluntary renewal of the same, in order to obtain the benefit of a modification of the manner in which the Farmers Home Administration Emergency Livestock loans, of which this was one, were administered by banks.

This is not a case for the application of the parol evidence rule. Weinbergs are not trying to vary the terms of the promissory note of November 14, 1975. They are

contending instead that the note itself, in all its terms, is evidence of an agreement between the Bank and the Weinbergs that a line of credit would be extended to them for seven years at an interest rate of 9.5 percent. The original promissory note is consonant with that contention. The parol evidence statute, § 28-2-905, MCA, includes in its provisions that "other evidence of the circumstances under which the agreement was made or to which it relates" is admissible. Section 28-3-402, MCA, provides that a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Here, the execution of the promissory note of November 14, 1975, and the procurement by the Bank of the Contract of Guarantee, all point to and confirm an agreement between the Weinbergs and the Bank for a line of credit on the terms contended for by the Weinbergs. When the conduct of the parties demonstrates the existence of an agreement between them, evidence of that conduct is admissible to establish the agreement. Veterans Rehabilitation Center, Inc. v. Birrer (1976), 170 Mont. 182, 551 P.2d 1001. The conduct of the Bank seven years later, in looking to the FmHA for performance of its Contract of Guarantee is indeed evidence of the agreement as argued for by the Weinbergs. We hold that there is sufficient evidence to establish a contract in existence between the Bank and Weinbergs for a line of credit, especially since this was the position of the Bank throughout the District Court trial.

Sufficiency of the Evidence to Sustain Compensatory Damages

The Bank contends that the compensatory damage award of $104,790.75 is not supported by sufficient credible evidence.

The attack on the compensatory award is two-pronged: 1) that the amount included for excessive interest paid by the Weinbergs is wrong on its face, and 2) that the amounts awarded for crop loss and other expenses are speculative.

Although the compensatory award by the jury is in the nature of general damages and is not broken down as to the items used by the jury to compute the award, it seems clear from the record that the compensatory award was based upon the amounts claimed by the plaintiff as items of damage, which the jury awarded to the Weinbergs in full.

The Weinbergs claimed an item of $33,158.17 as the amount of excess interest over and above 9.5 percent that they paid to the Bank on loans up to the credit line amount of $137,533.40.

The Weinbergs produced as part of their case the testimony of Donovan Kelley, a Billings CPA, who on the behalf of Weinbergs examined the Bank's loan liability ledger for the Weinberg loan and computed the amount of interest over and above 9.5 percent during the seven year period of the relationship on a credit line of $137,533.40. Kelley produced Exhibit 15 which showed that the total interest charged on the liability ledger amounted to $126,249.86, and that the total interest that should have been paid at the rate of 9.5 percent amounted to $93,091.69. On those figures, Exhibit 15 shows an excess of interest charged on the liability ledger of $33,158.17.

The Bank contends that Exhibit 15 shows that on May 27, 1983, there was a negative balance under Kelley's computations in favor of the Weinbergs of $7,916.67 and that this is the amount of interest overcharged to which the Weinbergs are entitled, and not the $33,158.17.

The Bank contends the figure of $33,158.17 includes the approximate $25,000.00 which the Weinbergs owed to the Bank, and which the Weinbergs never paid. They therefore contend the interest figures should be reduced by at least the amount of the unpaid indebtedness.

There are several difficulties with the Bank's argument on this item. First, in oral testimony, Kelley testified that the $33,158.17 figure was the amount of excess interest paid by the Weinbergs. The Weinbergs themselves testified that in their calculations they had paid at least $25,000.00 in excess interest. Secondly, the Bank's argument equates the negative balance on the principal of the debt to the overcharge of interest. Exhibit 15 demonstrates on its face that the negative balance is arrived at after the application to the principal indebtedness of the amounts recovered in liquidation of the Weinberg assets. In addition, on Exhibit 15, Kelley added to the balance due on November 14, 1982, the expiration date of the FmHA guaranty, and the accrued interest as part of the principal of the loan. Thirdly, the testimony of Kelley that the amount of excess interest was $33,158.17 was not controverted during the trial either by cross-examination or other testimony except a minor reference to the negative balance.

The second prong of the Bank's attack on the compensatory damage award relates to amounts apparently included within the general award: loss of three years' calf crops, $42,532.99; loss of 1983 barley crop, $7,349.00; and, loss of three years' hay production, $21,750.00. The Bank contends that the evidence is insufficient to justify such awards and that they are at best speculative.

The basis of these awards to the Weinbergs apparently stems from their testimony which was accepted by the jury. They testify that they were induced by the Bank to enter the original loan agreement, on representations by the Bank officers that they would be extended a line of credit up to the credit ceiling amount at an interest rate of 9.5 percent over the seven year life of the agreement. The next year they were told by the Bank that they had to sign a new note

each year in order to remove the escrow requirement first imposed. Although the Bank officers testified that at that time the Weinbergs had a choice, in reality their choice was either to sign the new notes or to lose the financing on their farming operation entirely. Thereafter, they signed new notes, sometimes in blank, which were filled in by the Bank. Evidence shows that the Bank breached its agreement, and its implied duty of good faith by failing to extend a line of credit in accordance with the Contract of Guarantee, charging interest in excess of the agreed upon rate which eventually amounted to an excess interest payment of $33,158.17. They testified that the Bank's conduct inflated their indebtedness, requiring them to liquidate their holdings as required by the Bank. In 1983, they were still eligible for an extension of refinancing through the FmHA, but they were informed in writing by FmHA that their eligibility for that loan was subject to "your guaranteed loan with Farmers State Bank of Worden being settled." Other lenders also refused Weinbergs financing unless they had settled with the Bank. Because the Bank required liquidation, they were forced to sell off their entire cattle herd, their farm machinery and equipment, they were unable to buy fertilizer, and properly take care of the crops in those three years. Without detailing the same in this Opinion, their evidence calculated for the jury, the value of the calf crops that they would otherwise have raised, and the crops they could have raised and sold. Although the Bank contends that the calf crop amounts were gross amounts and not net amounts, the evidence of these losses appears to be reasonably computed.

Montana law regarding the review of the sufficiency of the evidence has been oft repeated. When examining the sufficiency of the evidence to support a verdict, we review

the evidence in a light most favorable to the prevailing party. Kukuchka v. Ziemet (Mont. 1985), 710 P.2d 1361, 42 St.Rep. 1916; Anderson v. Jacqueth (Mont. 1983), 668 P.2d 1063, 40 St.Rep. 1451; Gunnels v. Hoyt (Mont. 1981), 633 P.2d 1187, 38 St.Rep. 1492; Rock Springs Corp. v. Pierre (1980), 189 Mont. 137, 615 P.2d 206; Groundwater v. Wright (1979), 180 Mont. 27, 588 P.2d 1003; In Matter of Estate of Holm (1979), 179 Mont. 375, 588 P.2d 531. "The Jury is in the best position to weigh the evidence and consider the credibility of witnesses." Rock Springs Corp., supra. Questions of fact are for the jury to resolve and should not be taken from the jury when reasonable men might draw different conclusions from the evidence. Heen v. Tiddy (1968), 151 Mont. 265, 269, 442 P.2d 434, 436; § 26-1-202, MCA. Rock Springs Corp., supra. When there is conflicting evidence, the credibility and weight given to the evidence is the province of the jury and not this Court. Mountain West Farm Bureau Mutual Insurance Co. v. Girton (Mont. 1985), 697 P.2d 1362, 42 St.Rep. 500; Gunnels v. Hoyt, supra; Holm, supra; In Re Carrols' Estate (1921), 59 Mont. 403, 196 P. 996.

This Court has repeatedly stated that it will not disturb the jury's verdict if the evidence provides reasonable grounds for different conclusions. Gunnels v. Hoyt, supra; Payne v. Sorenson (1979), 183 Mont. 323, 599 P.2d 362; Adami v. Murphy (1945), 118 Mont. 172, 164 P.2d 150. If there is substantial credible evidence supporting a jury verdict it cannot be overturned on the basis of insufficiency. Anderson v. Jacqueth, supra; Brogan v. Blanchard (1982), 200 Mont. 399, 650 P.2d 1390; Gunnels v. Hoyt, supra.

In Nicholson v. United Pacific Ins. Co. (Mont. 1985), 710 P.2d 1342, 1348-9, 42 St.Rep. 1822, 1830, we held,

"substantial evidence is relevant evidence which a reasonable person could accept as adequate to support a conclusion." Further, "Evidence may be inherently weak and still be deemed substantial, and substantial evidence may conflict with other evidence." Anderson v. Jacqueth, supra, citing Gunnels v. Hoyt, supra; In Matter of Estate of Holm, supra. Section 26-1-301, MCA, provides that the testimony of one credible witness is sufficient to prove any fact.

Accordingly, we affirm the compensatory award in this case.

### Implied Covenant Of Good Faith And Fair Dealing

The Bank contends that the evidence is insufficient to support a breach of an implied contract of good faith and fair dealing by the Bank as found by the jury.

The controlling case in this issue is that of Nicholson v. United Pacific Insurance Company (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822. In Nicholson, this Court engaged in an exhaustive examination of the tort of breach of implied covenant of good faith and fair dealing in Montana. Although Nicholson did not involve a bank, the principles set forth are applicable to cases involving bank contracts and bank relationships with its customers. In Nicholson, we held:

> The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party should then be compensated for damages resulting from the other's culpable conduct.

We have also held that the legal obligation of good faith and fair dealing has been extended to Bank's dealing with customers. Nicholson, supra; Tribby v. Northwestern Bank of Great Falls (Mont. 1985), 704 P.2d 409, 42 St.Rep.

1133; First National Bank of Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948. In Deist v. Wachholz (Mont. 1984), 678 P.2d 188, 41 St.Rep. 286, this Court recognized that there is a fiduciary obligation owed by a bank to its customer where a customer and officer of the Bank have entered into a confidential relationship. This is especially true when the Bank plays the role of advisor.

"The covenant of good faith and fair dealing has been implied in situations where there is no specific statutory duty, but where similar indicia of adhesion or inequality is present." Nicholson, supra; Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 464, 643 P.2d 198, 203.

The Weinbergs testified that they were encouraged and advised by Lawrence of the Farmers State Bank of Worden to expand their cattle operation. The Weinbergs further testified that the Bank participated in and encouraged the changes to be made regarding the Weinbergs farming operation and that, coupled with the fact that the Bank controls the finances, created a fiduciary obligation to the plaintiffs on the part of the Bank. In the immediate case, there is sufficient indication of inequality in bargaining positions between the Bank and the Weinbergs. The Bank held the means to allow the Weinbergs to continue to farm and if the Bank failed to advance the loan money, the Weinbergs would be forced out of their farming operations. As the bank officer testified, the Weinbergs "had a choice," but one of the choices would wipe them out financially.

The court's instructions on the implied covenant of good faith and fair dealing between parties adequately covered our law on the subject and principles set out in Nicholson:

> When parties, as here, are involved in contractual relationships, there sometimes arises, separate and apart from the contract, an implied covenant of good faith and fair dealing, which is that each

party has a justifiable expectation that the other will act as a reasonable person. The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. If in this case, you find from the evidence that the defendant, Farmers State Bank of Worden, acted arbitrarily, capriciously or unreasonably, such conduct exceeding the justifiable expections of the plaintiffs, Weinbergs, then such conduct is culpable and plaintiffs should be compensated for damages arising therefrom.

. . .

A mere breach of contract, without a showing of some special kind of impermissible activity, such as arbitrary, capricious or unreasonable acts exceeding the justifiable expectations of Thomas and Carolyn Weinberg, is not a breach of the implied duty of good faith and fair dealing.

. . .

A party is not required to totally disregard its own interest to show good faith.

. . .

A party against whom liability under a contract is asserted does not breach the implied covenant of good faith and fair dealing by disputing its liability under that contract so long as disputing liability, the party so disputing does not act arbitrarily, capriciously or unreasonably.

. . .

If you find from the evidence that the defendant Farmers State Bank has breached an implied covenant of good faith and fair dealing, by finding that Farmers State Bank of Worden has acted arbitrarily, capriciously or unreasonably, in excess of the justifiable expectations of the parties, then you must, in order to consider an award of punitive damages, find that, in addition, Farmers State Bank of Worden has been guilty of oppression, fraud or malice, actual or presumed. Breach of the implied covenant of good faith and fair dealing without

more, entitles a party to compensatory, and not punitive damages.

. . .

. . . Thomas and Carolyn Weinberg further contend that Farmers State Bank breached the implied covenant of good faith and fair dealing in raising the interest rate, in that an increase in the interest rate exceeded the justifiable expectation of the parties, and was done arbitrarily, capriciously and unreasonably.

. . .

. . . Farmers State Bank further contends that it has not breached the implied covenant of good faith and fair dealing in that its actions in raising the interest rate were within the justifiable expectations of the parties and were not arbitrary or capricious or unreasonable.

Farmers State Bank contends further that its actions were neither fraudulent nor malicious nor were they oppressive.

Under the instructions and the evidence, we determine that the finding of a breach of an implied covenant of good faith and fair dealing is supported. In such a case, we are controlled by the long-held standard of review:

When, as in this case, on appeal a judgment is challenged on the basis of insufficiency of the evidence to support it, there is no middle ground for the appellate court. We must find that the party appealing is entitled to judgment as a matter of law based on the evidence and if we do not so find, the judgment in favor of the other party must be affirmed.

Gunlock v. Western Equipment Company (Mont. 1985), 710 P.2d 1714, 1716, 42 St.Rep. 1882, 1884.

No Actual Damages Underlay The Award Of Punitive Damages

In this case, the jury fixed an award of punitive damages in the sum of $100,000.00. On appeal, the Bank

contends that there is no showing of actual damages underlying such an award.

In a special verdict, the jury found the defendants had breached the implied covenant of good faith and fair dealing against the Weinbergs and that such breach was fraudulent, malicious and oppressive.

This Court has previously held that punitive damages may be awarded where the plaintiffs were granted only nominal damages. The same is true even in cases where no monetary value has been assigned to the actual damages suffered. Lauman v. Lee (Mont. 1981), 626 P.2d 830, 38 St.Rep. 499; Butcher v. Petranek (1979), 181 Mont. 358, 593 P.2d 743.

In Gilmore v. Mulvihill (1940), 109 Mont. 601, 607, 98 P.2d 335, 338, this Court stated:

> A verdict is not to be technically construed, but is to be given such a reasonable construction as will carry out the obvious intention of the jury. In arriving at this intention, reference may be had to the issues made by the pleadings, the instructions submitted by the court, and the evidence introduced at the trial; and if by a fair and readable construction of it, in the view of the whole record, the intention of the jury is manifest, it should be allowed to stand.

### Sufficiency of the Evidence for Punitive Damages

Here, Bank contends that the award of punitive damages was improper and must have been the result of passion and prejudice. What was said by this Court in Gilmore v. Mulvihill, supra, is equally applicable to the jury award of punitive damages. As we have indicated above, the jury was given proper instructions to determine the breach had occurred. The jury was likewise instructed as to what it must find with respect to punitive damages. The Bank does not contend that those instructions were inadequate and indeed they seem to contain the necessary elements to

properly instruct the jury on this item. The jury having been properly instructed, once again, we are left to the familiar appellate rules which are recited above respecting the sufficiency of the evidence. The jury found a breach of an implied covenant, and it found that the breach was oppressive, malicious and arbitrary. Once having made that determination, the jury determines the amount of damages.

## Cross Appeal

Each of the Bank's promissory notes signed by the Weinbergs, and at least one of the security agreements provided that the Bank was entitled to reasonable attorney fees and costs if an action were brought in court to enforce the collection of the notes or the security agreement.

Under § 28-3-704, MCA, the right to attorney fees is reciprocal to all parties to the contract in any action based on the contract, when the contract provides for attorney fees to any of the parties. See, for example, Compton v. Alcorn (1976), 171 Mont. 230, 557 P.2d 292. Thus, the Weinbergs having successfully defended against the Bank's claim on its promissory notes are entitled in this case to reasonable attorney fees and costs.

Here the jury verdict was rendered in the Weinbergs favor on March 13, 1986. A hearing was held on the question of attorney fees and interest on April 17, 1986. Following the conclusion of that hearing, the court requested counsel for the Weinbergs to review his time records and report to the court by way of affidavit the amount of time spent defending against the Bank's counterclaim to recover on a promissory note and the amount of time spent on prosecuting the plaintiffs' claims for affirmative relief against the Bank. Thereafter plaintiffs' counsel submitted an affidavit showing a total of 223 hours spent in connection with the

Weinberg claim, of which he attributed 135.875 hours to defending the relief sought by the Bank.

The promissory note on which the Bank claimed nonpayment, that of April 26, 1982, included the following provisions:

> The makers, endorsers, and guarantors severally agree to pay a reasonable attorney fee if this notice is placed in the hands of an attorney for collection after maturity, and waive demand, protest, notice of protest, and notice of dishonor.

The Bank claimed that the Weinbergs were indebted to it in the sum of $25,991.53, plus interest on the promissory note. On August 23, 1983, its attorney wrote to Thomas A. Weinberg demanding the sum of $25,991.53 plus interest at the rate of 18 percent from May 27, 1983. The claim, plus interest to March 13, 1986 amounted, according to calculations of plaintiffs' counsel, to $39,036.80.

The District Court held a further hearing on attorney fees on June 17, 1986, and thereafter entered an order awarding the Weinbergs attorney fees to be recovered from the Bank in the amount of $12,500.00.

On appeal the Weinbergs claim that the District Court abused its discretion in fixing the attorneys fees for two reasons: (1) the District Court failed to take into account that plaintiffs' counsel undertook the risk of no payment if he were unsuccessful; and, (2) the District Court disregarded testimony from plaintiff's witness respecting the reasonable value of attorneys services in this case.

Although the Weinbergs brought the action in the first instance against the Bank in this case, the Weinbergs contend that the action was nonetheless defensive in nature. The letter from the Bank's attorney of August 23, 1983 informed the Weinbergs that unless payment was made within 5 days of the Bank's claim including interest, a duly authorized agent

of the Bank would enter the Weinbergs' premises and take possession of the collateral appearing in the security agreement. The Weinbergs filed their action against the Bank on August 29, 1983, contending the action was necessary to save the machinery and to continue farming, although they denied any obligation of the Bank. They sought a temporary restraining order and subsequent injunction to prevent the Bank from taking their farm machinery from them. Later they defended a claim and delivery action commenced by the Bank, again to repel the Bank's attempt to take possession of the collateral pending litigation. Thus Weinbergs' contend they were not simply defending against the counterclaim for the sum of $25,991.53, plus interest. Their action was against the Bank, but they were also defending against the repeated efforts of the Bank to take the Weinbergs' farm machinery and put them out of business.

The testimony at the attorney fees hearing featured John J. Cavan, a Billings attorney, who testified that a reasonable hourly charge in this case for services other than trial time would be $100 per hour, and for trial time $150 per hour, for compensation which in any event was reasonably certain to occur. He further testified that if the compensation was risky or uncertain, a reasonable hourly charge would be $200 per hour for nontrial services and $300 an hour for trial services.

The court's memorandum in connection with its finding of attorney fees states: "There was no evidence to suggest the compensation was not reasonably certain in this case. Having these facts in mind, the court concluded that $12,500.00 is an appropriate attorney's fee."

Complicating our consideration in this matter is a contingent fee agreement entered into between the Weinbergs and their attorneys' firm. On August 29, 1983, the Weinbergs

paid their attorneys $4,623.97 as a partial payment upon fees for services in connection with the firm's representation of the Weinbergs. The Weinbergs further agreed in writing to pay their attorneys one-third of all recovery made on their behalf in excess of $15,000.00 after the commencement of action based upon said claims, and 40 percent of all recovery in excess of $15,000.00 after the commencement of any trial based upon the claims. The contingent fee was further to be based upon any success with respect to the outstanding balance as claimed by Farmers State Bank. Without our setting forth here in detail the computations, we note that the contingent fee based on the judgment recovered and the defeat of the counterclaim less the deductible would amount to $91,531.02.

On cross-appeal, the Weinbergs claim that if the amount of their contingent fee is not awarded to them, they should at least be awarded the sum of $48,600.00 for services rendered based upon the testimony of counsel and the affidavit of hours submitted, and that the award of $12,500.00 by the District Court was an abuse of discretion.

Of course, in fixing an attorney fee in a proper case, the District Court is not bound a contingent fee agreement. This was established in Engelbretson v. Putnam (1977), 174 Mont. 409, 416, 571 P.2d 368, 372. Instead, Engelbretson directed that attorney fees be fixed in accordance with the standards first set out in Forrester & McGuinniss v. B & M Company (1904), 29 Mont. 397, 409, 74 P. 1088, 1093, and repeated in Crncevich v. Georgetown Recreation Corporation (1975), 168 Mont. 113, 119, 541 P.2d 56, 59:

> The circumstances to be considered in determining the compensation to be recovered are the amount and character of the services rendered; the labor, time, and trouble involved, the character and importance of litigation in which the services were

rendered, the amount of money or the value of property to be affected, the professional skill and experience called for, the character and standing in the profession of the attorneys;. . . the result secured by the services of the attorneys may be considered as an important element in determining their value.

It is clear from the memorandum and findings that each of the foregoing factors was considered by the District Court in this case. In addition, the District Court noted that if the contingent fee contract had been applied to the amount in controversy between the Bank and the Weinbergs based upon the promissory note, the fee would not result in more than $15,500.00.

There are two purposes in a statutory or contractual provision providing for attorney fees to a successful party. One is the hoped-for elimination of frivolous claims or defenses to claims; and the other is the intent of statute or the contract to make the party having to resort to court action whole if he or she is successful. It is incumbent upon us therefore to point out the reasons why, when parties such as Weinbergs here are faced with attorney fees amounting to $91,531.53, their recovery of attorney fees in the amount of $12,500.00 should be approved.

The result comes from the principles of contract, and the purposes of statutes or contractual provisions which provide for attorney fees. This court has in the past and does now continue to support the advocacy and necessity of reasonable retainer contracts based on a contingent fee where reasonably arrived at between parties competent to contract. To hold otherwise might prevent needy but worthy litigants from reaching the courthouse door.

On the other hand statutory or contractual provisions for attorney fees to the successful party are not based upon

contingency of collection, but rather upon the expectation that the losing party will in fact pay the attorney fees awarded. In a contingent fee arrangement, there is a factor of risk undertaken by the attorney that he may receive nothing for his labor. It is that factor of risk which prompts courts to approve contingent fees which might otherwise seem unnecessarily large. The risk of no return is a component or factor tending to support a larger fee. Such a risk is not contemplated in those cases involving statutory or contractual provisions for attorney fees. The contemplation then is that regardless of the result, the attorney will be paid for his labor. Because of that distinction, the holding of Compton v. Alcorn, supra, is correct, that a contingent fee contract does not bind a district court in determining a proper amount of attorney fees to be awarded under a statute or contract provision.

Since one of the purposes for a statutory or contractual provision for attorney fees is to make the successful party whole, it should be clear that the attorney fees when finally fixed by the court belongs to the party and is not subject to the contingent fee agreement. This point was demonstrated in Smith v. Howery (Mont. 1985), 701 P.2d 1381, 42 St.Rep. 995. There the Howerys recovered from the State $243,475.00 for total damages, $42,958.33 for interest on those damages, and $28,850.70 for costs and attorney fees. In that case, counsel for the plaintiffs, working on a 40 percent contingent fee contract, requested of the court $129,866.34 as and for their attorney fees. The computation of attorney fees did not include the amount awarded for costs and attorney fees by the District Court. We approved that approach taken in the Smith v. Howery case, and in that case upheld summary judgment based on that kind of computation.

We approve the fee awarded here by the District Court, though we are aware that where experienced counsel are involved, an attorney is entitled to compensation for the knowledge of a lifetime. One factor leading to our approval is that with the affirmance of the judgment in favor of the Weinbergs, the fees charged them under the contingent fee arrangement are in accordance with their contract for that portion of the judgment. The defeat of the Bank's claim against the Weinbergs will subject them to a fee of 40 percent of the Bank's claim, which the District Court pointed out would have amounted to $15,500.00. The award of $12,500.00 by the District Court does not appear out of proportion, since the District Court found that payment was reasonably certain.

We find no abuse of discretion with respect to the award of attorney fees in this case. However, Weinbergs in this case are entitled to further attorney fees on appeal. The judgment of the District Court is therefore affirmed both on the appeal and cross appeal, and the cause is remanded for further proceedings with respect to costs and attorney fees on appeal.

John C. Sheehy
_____
Justice

We Concur:

P. A. Turnage
_____
Chief Justice

_____

_____
Justices

- 35 -

_Frank I. Haswell_

Former Chief Justice
Frank I. Haswell, sitting
for Mr. Justice John C.
Harrison

Mr. Justice Fred J. Weber dissents as follows:

The majority opinion concludes that the plaintiffs were entitled to a $33,158.17 award of excess interest charged by the Bank. The majority points out the oral testimony to that effect and also refers to the exhibits. I conclude that the majority has misconstrued the figures contained in the exhibits and as a result has erroneously allowed the award of $33,158.17.

Exhibit 13 is the written exhibit prepared by Mr. Kelly, accountant for the Weinbergs, and presented as a part of the plaintiffs' case. The exhibit demonstrated Mr. Kelly's figures as he recomputed interest and principal on the entire history of the loan. In that exhibit Mr. Kelly computed interest at 9.5% which the plaintiffs contend is the correct interest rate, rather than the varying interest rates which the Bank used in the course of its computations of the balances owing by the Weinbergs. The computations are shown clearly by Mr. Kelly, demonstrating the application of payments to both interest and principal. This recomputation of interest and principal concludes with a showing that on May 27, 1983, there was a negative balance of $7,916.67. In other words, the exhibit clearly demonstrates that for the first time on May 2, 1983, the payments made by the Weinbergs exceeded the balance owing of both principal and interest. On May 2, 1983, Mr. Kelly computed the excess in payments made by the Weinbergs at $4,287.29. By May 9, 1983, that amount had increased to $7,440.09. Last, on May 27, 1983, the Weinbergs paid $476.58 resulting in a total overpayment of $7,916.67. The computations demonstrate that the Weinbergs were only trying to prove they had overpaid the Bank $7,916.67. In connection with that overpayment, Mr. Kelly noted that he had not computed interest on the negative balance due to the Weinbergs.

At the bottom of plaintiffs' Exhibit 13 he pointed out that the total interest charged by the Bank on the liability ledger was $126,249.86. The exhibit then sets forth the following calculation by accountant Kelly:

| | |
|---|---|
| Total interest charged on the liability ledger | $126,249.86 |
| Total interest all pages (which is the total of the interest calculated by Mr. Kelly at 9.5%) | 93,091.69 |
| Excess interest charged on the liability ledger | $ 33,158.17 |

The foregoing analysis is consistent with plaintiffs' Exhibit 13 which again demonstrated the total of the excess interest charged by the lender. Unfortunately, when the damages were argued to the jury, the attorney for the plaintiffs argued that excess interest of $33,158.17 was collected and therefore should be paid back to the Weinbergs. That was incorrect mathematically, based upon the evidence submitted by the plaintiffs. The only excess interest collected by the Bank as proved by the plaintiffs was $7,916.67. I would therefore modify the judgment as follows:

| | |
|---|---|
| Amount of interest awarded by the jury to the Weinbergs | $ 33,158.17 |
| Less amount of interest actually payable to Weinbergs | 7,916.67 |
| Amount by which the judgment should be reduced | $ 25,241.50 |

_____
Justice

Justice L. C. Gulbrandson joins in the foregoing dissent.

_____
Justice

38