No. 92-516

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

ROY BECKMAN,

       Plaintiff and Appellant,

  -vs-

JACK LACHER, d/b/a
LACHER FARMS,

       Defendant and Respondent.

FILED

JUN 21 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
                In and for the County of Cascade,
                The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           Roy Beckman, Pro Se, Great Falls, Montana

       For Respondent:

           Brian Bulger; Bulger Law Offices, Great
           Falls, Montana

                   Submitted on Briefs:  May 13, 1993

                            Decided:  June 21, 1993

Filed:

_____
          Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Eighth Judicial District Court, Cascade County, the Honorable Thomas M. McKittrick presiding. Roy Beckman (Beckman) appeals from a jury verdict awarding him $3,872.94 for breach of an oral contract involving a crop-share lease in Cascade County, Montana. We affirm.

Beckman presents numerous issues for review, but the following two alone are dispositive.

1. Whether substantial credible evidence supports the jury verdict.

2. Whether the District Court erred in directing the verdict with regard to punitive damages.

Beckman and respondent Jack Lacher (Lacher) entered into an oral agreement in May 1989. The agreement provided that Lacher would farm Beckman's property for Beckman and receive two-thirds of the harvest. Both parties are farmers. Beckman is a gentleman well along in years and has a serious hearing problem. While he possesses a hearing aid, the record indicates that he does not wear it regularly. Much of the misunderstanding that occurred in this relationship was admittedly due to Beckman's hearing deficiency.

The property involved here was farmed by a neighbor, Ron Robinson, until he died in 1989. Robinson also farmed for another neighbor, the Sears family, who negotiated with Lacher and Robinson's widow to have Lacher take over the farming of the Sears property. After Robinson died, Mrs. Robinson asked Lacher to spray and harvest her crop.

In May 1989, Mrs. Robinson brought Lacher and Beckman

2

together, suggesting that Lacher farm Beckman's property. At this meeting, Beckman and Lacher completed about eighty percent of their oral agreement concerning the farming of the property. Mrs. Robinson witnessed the twenty percent that was left for argument, but she was unable to confirm what was said. Lacher asked Beckman to reduce the agreement to writing, but Beckman never did.

From the onset, disagreements occurred concerning Lacher's farming methods. Lacher is a younger, scientific farmer who has a number of similar leases. He farms with modern equipment and is a thorough believer in the use of fertilizer in the dryland wheat country north of Great Falls. Beckman is an old-timer who did not go along with all the modern ideas of farming in that area. For instance, Beckman insisted that fertilizer be spread on the ground, not injected through the drills when the seeds were planted.

During the seeding process Beckman insisted that Lacher use his drills, which were forty to fifty years old, rather than his own modern drills. When Lacher brought his modern equipment into the fields to do the drilling, Beckman stopped him and demanded that he use his old equipment, which had to be repaired. As a result, some two or three weeks passed between early September, 1989, when Lacher brought his own equipment in, and the time he was finally able to get into the fields for drilling. Eventually the crop was "top-dressed" according to Beckman's specification, though Lacher, who had consulted an agronomist, believed that it would have been better for the crop if he had used a liquid form of nitrogen at the time of seeding.

3

Not all of the winter wheat seeding was successful, and portions had to be reseeded with spring wheat. At Beckman's direction the property was seeded with seed wheat similar to that used previously on the property, which had been stored at the Robinsons' place. The seeded spring wheat was fertilized by Lacher but not in the manner specified by Beckman.

After the fall 1989 seeding, Beckman wrote to Lacher indicating that he was terminating the lease, which was to have been for three years, but in the same letter stated that a written lease would follow.

Beckman's crop was harvested in the summer of 1990. Lacher harvested a total of 5,736 bushels of spring wheat and winter wheat combined. This was harvested from 299.6 acres for an average yield of 19.1 bushels per acre. The record indicates that this average was above what Beckman had previously received from this acreage when he or a lessee had planted and harvested it.

After the 1990 harvest, Lacher asked Beckman to settle up on the fertilizer, not including the fertilizer he had used on the spring wheat. Beckman refused to pay for his share even though Lacher testified that Beckman had not objected to fertilizing the crop. Beckman denied that he had ever agreed to pay for fertilizer. At harvest time Lacher placed the winter wheat in an elevator under his name and told Beckman that it would remain in the elevator until payment for the fertilizer was resolved. The spring wheat was stored in both Lacher's and Beckman's names.

The elevator manager testified as to the amounts of grain

4

Lacher delivered to the elevator and its average price. In addition he testified as to the average price of wheat at the time of delivery. He further testified that he had given all the grain tickets and information to Beckman several times after the dispute arose. He stated as did Lacher that Beckman was told he could sell his one-third of the spring wheat, but he had not done so by the time of the trial in August 1992.

Beckman filed a complaint in December 1990, requesting an accounting, costs, and punitive damages in the amount of $100,000. The complaint alleged that Lacher had failed to farm Beckman's land in a "proper and farm-like manner;" that Lacher had failed to store the crop in his and Beckman's names; and that Lacher had somehow not delivered all the wheat to the elevator. These allegations were completely disproved by testimony from the elevator manager, Lacher's hired hand, who drove the grain trucks to the elevator, and Lacher himself.

At trial, the only figures concerning the value of Beckman's share of the winter wheat and the seed wheat were provided by Lacher, who was called as an adverse witness. No conflicting evidence was produced by Beckman or his witnesses. Lacher offered to pay Beckman his share of the value of the winter wheat, plus interest; this amount, offset by one-third of the cost of the fertilizer, was what the jury awarded Beckman.

During the trial, Lacher moved the court for a directed verdict on the punitive damages issue. As Beckman had failed to produce any evidence to support punitive damages, the court ruled

5

in favor of Lacher.

On appeal, Beckman argues that punitive damages were justified because Lacher sold his share of the winter wheat without his consent, keeping a portion of the proceeds to cover one-third of the cost of fertilizer. Beckman insisted at the trial and continues to insist that he receive the equivalent of his share of the winter wheat in wheat and not in cash, and that he never agreed to pay for one-third of the cost of fertilizer. Although these statements clearly reflect a difference of opinion between Lacher and Beckman, they do not constitute evidence of conversion or fraud by Lacher. The District Court did not err in granting Lacher's motion for a directed verdict on punitive damages.

The transcript reveals that Beckman's counsel had considerable difficulty in presenting him as a witness, due to his impaired hearing and due to the fact that Beckman had very strong ideas of what he wanted to present, even though counsel seemed to advise him to the contrary. Counsel for Beckman at the time of the trial was the second counsel, Beckman having dismissed previous counsel, who had a lien against any judgment that Beckman might receive at this trial.

In reviewing a jury verdict, this Court's function is to determine whether substantial credible evidence supports the verdict. Weinberg v. Farmers State Bank of Worden (1988), 231 Mont. 10, 28, 752 P.2d 719, 730. This Court will not reverse a judgment based on a jury verdict when there is substantial evidence to support the verdict. Kleinsasser v. Superior Derrick Service,

6

Inc. (1985), 218 Mont. 371, 708 P.2d 568. In examining the sufficiency of evidence to support a verdict, we review the evidence in a light most favorable to the prevailing party. Weinberg, 752 P.2d at 730.

In this case, substantial credible evidence supports the exact figures arrived at by the jury. These figures were placed on a blackboard by Beckman for the jury's consideration; they were the only figures ever presented to the jury. Beckman apparently agreed to these figures in cross-examination; at any rate, he provided no conflicting evidence. Nor, after the trial, did he move for a new trial or an amended verdict, possibly due to the fact that he fired his counsel immediately after the jury verdict.

The jury awarded Beckman the sum of $5,000.44, representing one-third of the harvest delivered to the elevator at a price of $2.49 per bushel, as established by the testimony of the elevator manager. In addition it included prejudgment interest of ten percent from the time of delivery until the time of the trial, as was urged by Lacher. It also included 60.2 bushels of seed wheat at $3.80 a bushel, a figure which was undisputed at the time of the trial. This was the exact amount that Lacher's attorney proposed and that Beckman's attorney urged the jury to award Beckman.

The jury also awarded Lacher $920.41, representing one-third of the cost of fertilizer, plus $207.41 for interest at ten percent from the time of delivery to the time of trial. Thus, the net award to Beckman was $3,872.94.

We conclude that Beckman was awarded by a jury verdict the net

value of exactly the amount of grain he was entitled to under the contract. In addition, he was awarded interest that he described as "awfully generous." He got exactly what he bargained for.

The judgment of the District Court is affirmed.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to Montana Law Week, State Reporter and West Publishing Company.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

8

June 21, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Roy Beckman
P. O. Box 1955
Great Falls, MT  59405


Brian Bulger
Bulger Law Offices
410 Central Ave.
Great Falls, MT  59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy