# FILED

May 28 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0065

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2008 MT 183

MARK G. WEST and LEAH J. JEDINY,

      Plaintiffs, Counterclaim Defendants
      and Appellees,

   v.

THE CLUB AT SPANISH PEAKS, L.L.C.,

      Defendant, Counterclaim Plaintiff
      and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                     In and For the County of Gallatin, Cause No. DV 2004-669
                     Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Stephen R. Brown, Lucy T. France, Garlington, Lohn & Robinson, PLLP,
           Missoula, Montana

      For Appellee:

           Robert K. Baldwin, Trent M. Gardner, Goetz, Gallik & Baldwin, P.C.,
           Bozeman, Montana

                            Submitted on Briefs:  February 13, 2008

                                       Decided:  May 28, 2008

Filed:

                              _____
                                         Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      The Club at Spanish Peaks, L.L.C. (Spanish Peaks), appeals from several rulings and orders issued prior to, during, and after a jury trial held before the District Court in the Eighteenth Judicial District, Gallatin County.  This jury trial resulted in a judgment for appellees Mark G. West (West) and Leah J. Jediny (Jediny) exceeding one million dollars inclusive of interest, statutory penalties for violation of § 39-3-204(1), MCA, and attorney's fees.  We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      Spanish Peaks is a Montana limited liability company which developed a resort (Spanish Peaks Resort) in Big Sky, Montana.  Spanish Peaks Resort is a residential resort community which operates as a club, meaning that persons who purchase property in the resort area must also purchase a club membership.  Spanish Peaks is affiliated with a separate company, known as Spanish Peaks Holdings, L.L.C. (Holdings), which actually owns the real property comprising the Spanish Peaks Resort area.

¶3      West began his employment with Spanish Peaks on December 1, 2003, as the vice president of sales and marketing.  In this position, West was responsible for working with local and regional real estate brokerage firms to promote and sell lots and "built products" (i.e., homes, cabins, condominiums, or townhomes) in the Spanish Peaks Resort, and another resort known as Lone Moose Meadows.  Prior to his employment with Spanish Peaks, West executed two employment contracts, one on November 17, 2003, and one on November 24, 2003.  The contracts are nearly identical.  Both cover a

wide range of subjects pertaining to West's employment with Spanish Peaks, including a job description, compensation, and provisions regarding his potential termination.

¶4 Paragraph 8 of both versions of the contract covers the issue of West's compensation and contains the following identical provisions:

8.1 <u>Base Compensation</u>. In consideration of services rendered by Employee to Resort, Resort shall pay Employee a base salary of $175,000 per year, payable biweekly through twenty-six pay periods commencing in early December 2003, pro rata to the commencement date of December 1, 2003 ("Base Compensation"). Base compensation during the first extension shall increase to $210,000 per year. Base compensation during the second extension shall increase to $225,000 per year.

. . . .

8.3 <u>Commission Compensation</u>. Employee shall earn Commission Compensation as an override on sales closed on the following products:
a. 1.0% commission on all lot/homesite sales within the Spanish Peaks Resort or the Lone Moose Resort Meadows (LMM) projects.
b. 0.5% commission on all built product (homes, cabins, condominiums, townhomes etc) within the Spanish Peaks or Lone Moose Meadows projects.

8.4 <u>Spanish Peaks Resort Lot</u>.

8.4.1 <u>Lot Discount</u>. Resort agrees to offer a lot within the Spanish Peaks Resort Project (in either Estates or Resort) for sale to Employee at a 25% discount from the then current list price ("Lot Discount"). Title to the Lot shall be conveyed subject to usual restrictions, covenants, easements and other typical matters of record against the Lot, and if Employee chooses to avail himself of the Company mortgage, that lot shall be subject to a mortgage in favor of Resort.

¶5 Moreover, both agreements contain termination clauses. Paragraph 13 of both contracts reads as follows:

**13. Termination for Cause.** The employment of Employee by Resort may be terminated immediately in the sole discretion of Resort upon the occurrence of any of the following causes:

3

. . . .

13.2 In the event Employee shall be guilty of fraud, dishonesty, or any other act of misconduct in the performance of employee's duties on behalf of Resort.

¶6    Paragraph 14 of one of the contracts reads as follows:

**14. Termination With Notice.**  This Agreement may also be terminated by either party without cause, upon 120 days' written notice to the other, in which case the termination shall be effective at the end of the 120 days' notification period.

Significantly, paragraph 14 of the other contract reads as follows, with the additional language in italics:

**14. Termination With Notice.**  This Agreement may also be terminated by either party without cause, upon 120 days' written notice to the other, in which case the termination shall be effective at the end of the 120 days' notification period. *Any outstanding commissions and bonuses due at time of termination shall be paid to the Employee in accordance with the closing schedule of associated properties without deduction or penalty of any kind except for normal payroll deductions and taxes within [a] 30 day period after closing of the sales.*

West claims this additional language was inserted as a result of negotiations between he and Spanish Peaks.  In any event, the District Court determined that the employment contract includes the additional sentence of paragraph 14 from the second contract, and the parties do not dispute this determination on appeal.  Moreover, both agreements are identical with respect to other provisions key to this case, namely paragraph 17, entitled "Proration of Base Compensation," and paragraph 22, "Entire Agreement," which are reproduced in full below.  Thus, although there were two separate employment contracts,

4

we will simply refer to both of these contracts as the Employment Agreement throughout this Opinion.

¶7 In early 2004, an individual named Wayne Lee purchased Lot 84 in the Spanish Peaks Resort and a club membership in Spanish Peaks. West and Spanish Peaks differ on what transpired next. According to West, Lee became unhappy with the Spanish Peaks Resort and wished to sell Lot 84. West claims that he assisted Lee in getting Spanish Peaks to purchase the lot, but that Spanish Peaks would not pay Lee for the lot until it had a third-party buyer. A buyer was found, but the deal fell through. West claims that Lee then approached him about personally buying Lot 84. West thought this was a perfect solution to Lee's dilemma because he and Jediny (his fiancé at the time but now his wife) were in the process of purchasing Lot 85 under the terms of paragraph 8.4.1. Jediny eventually purchased Lot 84 from Lee.

¶8 According to West, he fully apprised executives from Spanish Peaks of this real estate transaction. However, Spanish Peaks disagrees. It claims that the Lees entered into a contract with Holdings, whereby Holdings agreed to repurchase Lot 84 at the original price of $330,000.00, with the closing contingent upon Holdings entering into an agreement to sell Lot 84 to another buyer. Spanish Peaks claims that West wrote a contract for Jediny to purchase Lot 84 without its knowledge, and in spite of the repurchase contract already executed between Holdings and Lee. Spanish Peaks claims that under West's leadership it continued to include Lot 84 in its sales portfolio, and that West continued to advocate its sale even though he and Jediny would have been the only parties to benefit from the transaction. Moreover, Spanish Peaks continued to list Lot 84

5

at a purchase price of $395,000.00; thus, upon its sale, Jediny and West would stand to immediately gain a profit of more than $60,000.00.

¶9    Spanish Peaks asserts that it discovered the existence of the Jediny-Lee contract to purchase Lot 84 for the first time in early November of 2004. After this transaction was discovered, Spanish Peaks claims that West made efforts to seize and shred the original buy-back contract between Holdings and Lee, and that he also tried to delete scanned versions of the contract from the Spanish Peaks' computer system.

¶10    At a meeting on November 8, 2004, Spanish Peaks confronted West about his actions, and presented him with a confidential separation agreement and general release (Separation Agreement). The Separation Agreement stated, among other things, that West would voluntarily resign his position, convey Lot 84 to Spanish Peaks, agree not to sue Spanish Peaks, and that, as consideration for the Separation Agreement, Spanish Peaks would forego its right to recoup what it claimed were $5,000.00 in damages as a result of West's actions. The Separation Agreement stated that, upon its acceptance by West, no further amounts would be due or owed from Spanish Peaks to West for, or in any way relating to or connected with, West's employment with Spanish Peaks. Moreover, it stated its acceptance by West would "satisfy all sums which might otherwise be due you from [Spanish Peaks], including, without limitation, any real estate or membership benefits and any commission or bonus payments . . . ." West refused to accept the Separation Agreement. As a result, Spanish Peaks terminated West's employment for what it claimed were his fraudulent and dishonest actions in

misappropriating a real estate profit from Spanish Peaks and misleading Spanish Peaks about his actions.

¶11 West claims that his actions were above board and that his firing was simply a pretext so that Spanish Peaks would not have to pay him hundreds of thousands of dollars in "trailing commissions"; i.e., commissions for sales that West had arranged, but that had not yet closed. West claims he was lured into the November 8 meeting under false pretenses, given a "pre-drafted take-it-or-leave it release" in an effort to intimidate him into releasing all claims against Spanish Peaks, and then fired.

¶12 On November 26, 2004, West filed suit against Spanish Peaks in District Court, with Judge Holly Brown initially presiding. In Count I of his complaint, West sought a declaration that Spanish Peaks was required, under the terms of the Employment Agreement, to make bonus payments to West for commissions on executed sales and purchase agreements which were in place when West was terminated, but had not yet closed. Count II asserted breach of contract and breach of the covenant of good faith and fair dealing claims for Spanish Peaks' failure to pay him for commissions on sales which had closed since his termination. Count III asserted a claim seeking damages, penalties, and attorney's fees for alleged violations of the Montana Wage Protection Act, Title 39, Chapter 3, MCA (Wage Act).

¶13 Spanish Peaks answered on December 27, 2004, and filed a number of counterclaims, including breach of the Employment Agreement and covenant of good faith and fair dealing, breach of fiduciary duty, fraud, interference with contractual relations, intentional interference with prospective economic advantage, and negligent

7

misrepresentation. Subsequently, on February 8, 2005, Spanish Peaks filed a notice of lis pendens in the District Court with respect to Lot 84. The ostensible reason for this filing was that West had committed constructive fraud and interference with Spanish Peaks' contractual relations and prospective economic advantage by facilitating the sale of Lot 84 when Spanish Peaks had a contractual interest in the purchase of that lot.

¶14 On April 28, 2005, West sought and was granted leave to amend his original complaint. The amended complaint added Jediny as a plaintiff to the suit, and seven new counts to the complaint itself. Among those new counts were the following: actual fraud/negligent misrepresentation (Count IV); breach of the Employment Agreement and the covenant of good faith and fair dealing (Count V); slander of title (Count VI); breach of contract to purchase Lot 85 at a price substantially below market value (Count VII); negligence (Count VIII); intentional interference with prospective economic advantage (Count IX); and punitive damages (Count X). In particular, Count VI alleged that Spanish Peaks improperly filed a lis pendens against Lot 84, and that Jediny suffered special damages as a result of its filing. Count VII alleged that West and Jediny had a contract to purchase Lot 85 under the terms of West's Employment Agreement at a below market price, that Spanish Peaks breached the Employment Agreement by failing to perform by its terms, and that West and Jediny were entitled to damages equal to the difference between the market value of Lot 85 and its price under the terms of the Employment Agreement.

¶15 As proceedings continued in the District Court, a number of motions were filed and argued by both parties. On November 7, 2005, West and Jediny filed a motion for

partial summary judgment seeking a declaration that the Employment Agreement was ambiguous as a matter of law. Furthermore, West asked that the Employment Agreement be construed against Spanish Peaks, requiring it to pay West "trailing commissions"— i.e., bonuses for sales which West earned but which did not close until after his termination. West and Jediny also sought partial summary judgment on Counts VI, VIII, and IX of their amended complaint, and partial summary judgment on all of Spanish Peaks' counterclaims. That same day, Spanish Peaks filed a motion for partial summary judgment seeking to dismiss West's declaratory judgment action with respect to Count I of his original complaint. Arguments on these motions were heard before Judge Holly Brown on February 2, 2006.

¶16 The District Court granted in part and denied in part West's summary judgment motion, and denied in full Spanish Peaks' motion. On Count I, Judge Holly Brown found that the Employment Agreement was susceptible to two reasonable interpretations on the issue of whether West was entitled to trailing commissions for sales that he had facilitated prior to his termination, but which did not close until after he was fired. Thus, she ruled the Employment Agreement was ambiguous as a matter of law. Consequently, she construed the Employment Agreement against Spanish Peaks and ordered that the intent of the parties on the issue of trailing commissions would be decided by a jury.

¶17 With respect to Counts VI, VIII, and IX, the District Court concluded as a matter of law that Spanish Peaks' filing of the lis pendens on Lot 84 was not authorized under § 70-19-102, MCA. The District Court noted that while several of Spanish Peaks' counterclaims arose out of Jediny's purchase of Lot 84, none of those claims affected the

9

title or right of possession to Lot 84, nor did Spanish Peaks seek title to or possession of the lot. Therefore, the District Court concluded as a matter of law that Spanish Peaks' action constituted slander of title as alleged in Count VI, and consequently granted summary judgment on Count VIII (negligence) and Count IX (intentional interference with prospective economic advantage), since both of those claims were premised on the allegation that Spanish Peaks' lis pendens on Lot 84 was unauthorized. Additionally, the District Court dismissed all of Spanish Peaks' counterclaims. Spanish Peaks does not appeal this dismissal.

¶18 On September 5, 2006, Judge Holly Brown recused herself from the case, and Judge John Brown assumed jurisdiction over the proceedings. A jury trial began on October 16, 2006, and concluded with a verdict from the jury on October 27, 2006.

¶19 During the course of the trial, Judge John Brown made a number of rulings which Spanish Peaks now appeals. The first was a ruling which allowed the Separation Agreement to be admitted into evidence. Prior to trial, Spanish Peaks had unsuccessfully sought to exclude the admission of this evidence on the grounds that it was an offer of compromise, and thus inadmissible under M. R. Evid. 408. When West then offered the Separation Agreement at trial, Spanish Peaks renewed its objection. The District Court overruled the objection and allowed the Separation Agreement to be admitted on the grounds that it was offered not to prove Spanish Peaks' liability but rather "for another purpose" under M. R. Evid. 408—namely, to demonstrate that West's firing was pretextual. Spanish Peaks then moved for a cautionary jury instruction to the effect that the jury should not infer from the Separation Agreement's admission that Spanish Peaks

was in any way culpable. The District Court denied the motion and deferred ruling on jury instructions until a later time. Spanish Peaks also asked that West be prevented from arguing that the Separation Agreement should be construed as indicating that Spanish Peaks did something wrong or was culpable. This motion was denied as well, the District Court stating that West would be allowed to argue that his firing was a pretext.

¶20 The second ruling now at issue was an October 19, 2006 ruling imposing sanctions against Spanish Peaks under M. R. Civ. P. 37. During discovery, West submitted Interrogatory No. 10 to Spanish Peaks, which reads as follows:

> **<u>INTERROGATORY NO. 10</u>**: Please state the amount of compensation that Spanish Peaks would have had to pay to Mr. West for sales that were scheduled for closings as of the time of Mr. West's termination, had Mr. West not been terminated.

¶21 In response, Spanish Peaks provided a spreadsheet which contained real estate phase descriptions, lot numbers, actual closing dates, prices and the dates of purchase and sales agreements. Spanish Peaks later filed a supplementary response in which it objected to the interrogatory on the grounds that it was "vague, overly broad or general, ambiguous, confusing and unintelligible, or argumentative in its present form." Without waiving these objections, Spanish Peaks further stated that it had already provided this information in response to a previous production request by West.

¶22 Believing Spanish Peaks had not provided the requested answer in these responses, West moved for sanctions against Spanish Peaks on November 7, 2005, seeking to preclude Spanish Peaks from disputing at trial West's evidence concerning the amount of the trailing commissions due to him under the Employment Agreement. West

11

argued that the information produced by Spanish Peaks was not sufficient because it failed to provide a specific calculation of the outstanding trailing commissions potentially owed to him. That same day, West also filed a motion in limine seeking the same sanctions. Spanish Peaks opposed both motions, arguing that it had supplied the requested information and that sanctions were not warranted.

¶23 On July 31, 2006, Judge Holly Brown issued an order on the motions, stating that she had "no way to know" whether Spanish Peaks was actually withholding information on this issue, but emphasizing that "Spanish Peaks must comply with and continually supplement Plaintiffs' discovery requests." Accordingly, Judge Holly Brown ordered that "[t]o the extent it has not yet done so, the Court hereby orders Spanish Peaks to supply the requested report within ten (10) days of the date of this Order." Spanish Peaks subsequently transmitted additional sales reports to West on August 10, 2006.

¶24 At the end of the third day of trial, when West objected to the admission of some sales traffic reports by Spanish Peaks, this issue resurfaced. West argued that although Spanish Peaks had provided him with additional information related to its sales, it still had not provided him with a specific calculation of the compensation it believed would be owed to him should the jury find that Spanish Peaks breached the Employment Agreement. West argued that, as a sanction, Spanish Peaks should be prevented from disputing any calculations he might offer on the amount of damages owed.

¶25 Outside the presence of the jury, West argued that it was prejudicial to him to be in the midst of trial and still not know what Spanish Peaks believed the measure of damages should be nor how Spanish Peaks would arrive at such a figure. Spanish Peaks

argued that it had supplied all the data West needed to make his calculations and that it was simple math for him to come up with a figure of damages. Based on the data, West had previously submitted a figure of damages in the amount of $464,924.59. Spanish Peaks responded that it would argue the amount of damages was either zero or a number less than $464,924.59, but it refused to give a specific figure, or state how it would arrive at its calculation, maintaining that the jury would be able to weigh the evidence before it and appropriately calculate a damages figure. Having to disclose such a figure in advance, Spanish Peaks argued, would force it to telegraph its closing arguments on this issue.

¶26 Judge John Brown disagreed with Spanish Peaks and granted West's motions for sanctions under M. R. Civ. P. 37(b)(2). He ruled that as a result of its failure to respond to Interrogatory No. 10 with a specific damage figure, Spanish Peaks would be limited to arguing either that damages were $0.00 or $464,942.59, the figure provided by West.

¶27 A third issue on appeal arises from the District Court's denial of Spanish Peak's motion for a directed verdict. After West rested, Spanish Peaks moved for a directed verdict on Count VII of West's complaint which alleged breach of a contract to allow him to purchase Lot 85 at a discount. (*See* ¶ 4). Prior to his termination, West had elected to purchase Lot 85 under the terms of his Employment Agreement and had entered into a contract with Holdings to purchase it. The District Court deferred its ruling until Spanish Peaks had an opportunity to file briefs on the motion. Two days later, Spanish Peaks filed those briefs, in which it argued that West failed to point to any communication from Spanish Peaks stating that he could not close on Lot 85, and further

13

that West had not yet even purchased Lot 85 or been unsuccessful in obtaining financing from Spanish Peaks under the terms of his Employment Agreement. The District Court denied the motion.

¶28 Spanish Peaks filed a post-trial motion under M. R. Civ. P. 50 for judgment as a matter of law, arguing that its motion for a directed verdict should have been granted. It maintained that because Holdings, not Spanish Peaks, was the contracting party with West for the sale of Lot 85, there was no legal basis for a jury to find that it had breached the contract. The District Court, however, denied this motion as well, concluding that Spanish Peaks was prevented from asserting this argument due to pretrial rulings which forbade it from doing so.[1]

¶29 A fourth ruling on appeal stems from the decision by the District Court during trial to limit the testimony of a witness proffered by Spanish Peaks, Martha Johnson (Johnson). During its case-in-chief, Spanish Peaks attempted to elicit testimony from Johnson, a local real estate broker, about her experience with the custom and practice in Montana concerning payments of "trailing commissions." West objected that Johnson's testimony on this subject should not be allowed because it was not based on facts pertaining to this case, and, further, that she was an undisclosed expert witness. The District Court sustained West's objection and did not allow Johnson to testify because

---

[1] On October 16, 2006, Judge John Brown granted West's motion to strike a contention which Spanish Peaks wanted to add to the pretrial order to the effect that West and Jediny had a contract to purchase Lot 85 with Holdings, not Spanish Peaks. Spanish Peaks has not appealed this ruling.

she was an undisclosed expert and because her testimony was irrelevant since she was not an employee of Spanish Peaks.

¶30    On October 27, 2006, the jury returned a verdict in this matter. Although the special verdict form contained a total of twenty-four questions, we will recite only the jury's findings on those issues which are the focus of the present appeal. The jury found that Spanish Peaks breached the Employment Agreement by refusing to pay West bonuses and commissions he had earned at the time of his termination. As a result, West was awarded damages of $464,942.59. The jury further found that Spanish Peaks' filing of the lis pendens on Lot 84 caused damage to Jediny in the amount of $154,937.50. The jury also found that Spanish Peaks breached the contract which would have allowed West to purchase Lot 85, and that West's damages as a result of this breach were $85,000.00.

¶31    After the jury returned its verdict, the District Court then addressed West's claims for wages and penalties under the Wage Act, as the parties had previously stipulated that the District Court would decide this issue. West maintained that the trailing commissions or bonuses he was entitled to under his Employment Agreement constituted wages within the meaning of the Wage Act, and that since he had earned those payments and Spanish Peaks improperly withheld them, he was entitled to statutory damages. The District Court agreed with West, and concluded in its order dated December 6, 2006, that, based on the jury's determination that Spanish Peaks had breached the Employment Agreement, West was entitled to a statutory penalty—over and above the $464,924.59 in bonuses and accrued interest on that sum—in the amount of $255,718.42. In addition to awarding a statutory penalty under the Wage Act, the District Court also held that West

was entitled to recover costs and attorney's fees. The District Court subsequently entered a judgment on December 19, 2006.

¶32 Finally, on February 22, 2007, the District Court issued an order for attorney's fees and costs. It awarded costs to West and Jediny in the amount of $20,137.19. Additionally, the District Court awarded attorney's fees to West in the amount of $358,580.54, based on a 40% contingent fee arrangement between West and his attorneys. The District Court based this figure on the following awards: (1) $464,942.59 in unpaid wages to West; (2) $252,718.42 penalty on the unpaid wages under the Wage Act; (3) $61,624.35 prejudgment interest on the unpaid wages; (4) $29,166.00 in damages for West's wrongful termination; and (5) $85,000.00 in damages for Spanish Peaks' breach of its contract to allow West to purchase Lot 85. The District Court awarded these fees based on the fee-shifting clause contained in the Employment Agreement, as well as the attorney's fees provision of the Wage Act at § 39-3-214(2), MCA.

¶33 Spanish Peaks now timely appeals the District Court's grant of summary judgment, the aforementioned trial rulings of the District Court, the order granting penalties in favor of West under the Wage Act, and the District Court's award of attorney's fees.

## ISSUES

¶34 We state the issues on appeal as follows:

¶35 **Issue One:** *Did the District Court err in concluding the Employment Agreement was ambiguous?*

16

¶36    **Issue Two:** *Did the District Court err in concluding that Spanish Peaks' filing of the lis pendens on Lot 84 was not authorized under § 70-19-102, MCA?*

¶37    **Issue Three:** *Did the District Court abuse its discretion by allowing the admission of the Separation Agreement?*

¶38    **Issue Four:** *Did the District Court abuse its discretion in imposing sanctions against Spanish Peaks by limiting its presentation of evidence and argument on the issue of damages for breach of the Employment Agreement?*

¶39    **Issue Five:** *Did the District Court err in denying Spanish Peaks' motion for a directed verdict and post-trial motion for judgment as a matter of law on the claim that it breached an agreement to allow West to purchase Lot 85?*

¶40    **Issue Six:** *Did the District Court abuse its discretion by limiting the testimony of Johnson on the custom and practice in Montana of paying trailing commissions after an employee's termination?*

¶41    **Issue Seven:** *Did the District Court err in ordering penalties in favor of West for Spanish Peaks' alleged violation of the Wage Act?*

¶42    **Issue Eight:** *Did the District Court abuse its discretion in ordering attorney's fees to West in the amount of $358,580.54?*

## STANDARDS OF REVIEW

¶43    We review appeals from a district court's grant of summary judgment de novo, applying the standards established in M. R. Civ. P. 56(c), meaning the moving party must establish there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Flathead Citizens for Quality Growth, Inc. v.*

17

*Flathead Co. Bd. Of Adjustment*, 2008 MT 1, ¶ 31, 341 Mont. 1, ¶ 31, 175 P.3d 282, ¶ 31 (quotations and citations omitted). Once this burden has been satisfied, the non-moving party may raise a genuine issue of material fact by presenting substantial evidence essential to one or more elements in the case. *Flathead Citizens*, ¶ 31. Moreover, a district court's conclusions of law are reviewed for correctness. *Flathead Citizens*, ¶ 31.

¶44 Evidentiary rulings by a district court are reviewed for an abuse of discretion. *Faulconbridge v. State*, 2006 MT 198, ¶ 22, 333 Mont. 186, ¶ 22, 142 P.3d 777, ¶ 22. Similarly, we review a district court's decision to impose sanctions under M. R. Civ. P. 37 for an abuse of discretion. *Schuff v. Jackson*, 2008 MT 81, ¶ 15, 342 Mont. 156, ¶ 15, 179 P.3d 1169, ¶ 15. A district court's determination of attorney's fees is also reviewed for an abuse of discretion. *Donnes v. Orlando*, 221 Mont. 356, 361-62, 720 P.2d 233, 237 (1986). When reviewing for an abuse of discretion, "[w]e consider whether the trial court in the exercise of its discretion acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, in view of all the circumstances, ignoring recognized principles resulting in substantial injustice." *Schuff*, ¶ 15 (quotation omitted).

¶45 A district court's decision to deny a motion for a judgment as a matter of law, however, we review de novo. *State v. Marler*, 2008 MT 13, ¶ 20, 341 Mont. 120, ¶ 20, 176 P.3d 1010, ¶ 20. "Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury and all such evidence and any legitimate inferences that might be drawn from that evidence must be considered in the light most favorable to the party opposing the motion."

*Bevacqua v. Union Pacific R.R. Co.*, 1998 MT 120, ¶ 46, 289 Mont. 36, ¶ 46, 960 P.2d 273, ¶ 46.

**DISCUSSION**

¶46    **Issue One:** *Did the District Court err in concluding the Employment Agreement was ambiguous?*

¶47    The Employment Agreement between West and Spanish Peaks contained two termination clauses. Under paragraph 14, either party could terminate the Employment Agreement without cause upon 120 days notice. Paragraph 14 also specifically stated that if either party terminates with notice, "[a]ny outstanding commissions and bonuses due at [the] time of termination shall be paid to the Employee in accordance with the closing schedule of associated properties without deduction or penalty of any kind except for normal payroll deductions and taxes within [a] 30 day period after closing of the sales."

¶48    Paragraph 8 of the Employment Agreement describes how West is to be compensated with respect to his base salary and commissions on sales closed. (*See* ¶ 4.) Paragraph 13 is silent on the issue of whether West would receive outstanding bonuses, or "trailing commissions," on sales he earned, but which had not yet closed, in the event he was terminated for cause. (*See* ¶ 5.) Additionally, the Employment Agreement contains the following paragraphs:

> **17. Proration of Base Compensation.** Upon termination of employment, the compensation payable to Employee pursuant to paragraph 8 shall be pro rated to the effective date of such termination and shall be payable on the first day of the month following such termination date, provided that [sic] if Employee is terminated under paragraph 13, for cause, or Employee terminates under paragraph 14 without the required notice.

19

**22. Entire Agreement.** This Agreement constitutes a full and final expression by the parties and supercedes all prior oral or written negotiations and agreements. This Agreement may be modified only by a writing signed by both parties.

¶49 In her grant of summary judgment on July 31, 2006, Judge Holly Brown concluded that the Employment Agreement was subject to more than one reasonable interpretation on the issue of whether West should receive trailing commissions, and thus was ambiguous as a matter of law. The District Court concluded that while paragraph 17 requires West's compensation to be prorated to the date of his termination if fired for cause under paragraph 13, or if terminated with notice under paragraph 14, it does not address compensation for trailing commissions in the event West was terminated without cause. Furthermore, paragraph 17 provides that if West is terminated under paragraph 13, he is to be compensated pursuant to paragraph 8. Paragraph 8.1 addresses West's "Base Compensation," while paragraph 8.3 addresses West's "Commission Compensation." (*See* ¶ 4). In other words, although paragraph 17 itself only refers to "Base Compensation," by incorporating the provisions of paragraph 8.3 which addresses West's "Commission Compensation," it is unclear whether West would be entitled only to base compensation under paragraph 17, or to both base and commission compensation as discussed in paragraph 8.

¶50 Moreover, the District Court noted that paragraph 8.3 itself gives rise to additional interpretation questions. For instance, while it states that West will earn a commission on sales "closed," the precise meaning of the term "closed" is not defined in the contract. As stated by Judge Holly Brown, "[t]his could either mean that West 'earned' a

20

commission upon making a sale, with commission to be paid when the sale closed, or that he 'earned' the commission when the sale closed and would be paid at that time. A salesperson generally 'earns' a commission when the salesperson makes the sale, even though payment of commission may not occur until title is transferred or the purchase price is paid."

¶51 Complicating the matter was the explicit reference in paragraph 14 to the fact that West would be entitled to receive "outstanding commissions and bonuses" which were "due" at the time of the termination "in accordance with the closing schedule" of such properties, the implication being that commissions are considered to be "due" when "earned," with payment at a later date simply being a function of the nature of real estate transactions and the fact that actual closings occur at a later date. Thus, Judge Holly Brown concluded as follows:

> According to paragraph 14, commissions are "due" at the time of termination regardless of whether the sales had closed. Paragraph 14 indicates the parties intended commissions to be paid if termination was with notice, even for sales that had not yet closed. Paragraph 13 is not as clear. Paragraph 13 provides that West "earns" a commission on "sales closed," but it does not define these terms. Thus, there are two reasonable interpretations of this contract.

¶52 Accordingly, because of these contract ambiguities, the District Court construed the clauses in question against Spanish Peaks, the drafter, and ordered that the jury would decide the parties' intent with respect to the issue of whether West was entitled to trailing commissions.

¶53 Spanish Peaks argues that the District Court erred in concluding that the Employment Agreement was ambiguous. We disagree. Whether an ambiguity exists in a

21

contract presents a question of law. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 21, 306 Mont. 321, ¶ 21, 34 P.3d 87, ¶ 21. "An ambiguity exists where the language of a contract, as a whole, reasonably is subject to two different interpretations." *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 17, 330 Mont. 282, ¶ 17, 127 P.3d 436, ¶ 17. If a contract is found to be ambiguous, it is to be interpreted "most strongly" against the party who drafted it. *Eschenbacher*, ¶ 24. Moreover, "when a contract term is ambiguous, interpretation of the term involves determining a question of fact regarding the intent of the parties to the contract." *Wurl*, ¶ 17.

¶54 Based upon the foregoing contract analysis and law, the District Court did not err in concluding that the Employment Agreement was ambiguous on the issue of whether West would be paid trailing commissions or bonuses if he was terminated for cause under paragraph 13. Thus, the District Court did not err in ordering that the parties' intent on this issue be submitted to the jury.

¶55 **Issue Two:** *Did the District Court err in concluding that Spanish Peaks' filing of the lis pendens on Lot 84 was not authorized under § 70-19-102, MCA?*

¶56 As explained above, the District Court concluded that Spanish Peaks' filing of a lis pendens on Lot 84 was improper and unprivileged as a matter of law. The District Court noted that a plaintiff or defendant may file a notice of lis pendens in "an action affecting the title or right of possession of real property," under § 70-19-102, MCA, and further noted that under *Paulson v. Lee*, 229 Mont. 164, 745 P.2d 359 (1987), a person filing a lis pendens not need show an actual claim to title or possession in order to file such an action. However, the District Court concluded that, although several of Spanish

22

Peaks' counterclaims arose out of Jediny's purchase of Lot 84, none of those counterclaims affected the title or right of possession of Lot 84 and, further, Spanish Peaks did not seek title to or possession of this lot. Thus, she concluded that the filing of the lis pendens was improper under § 70-19-102, MCA, and granted West's motion for summary judgment on Counts VI, VIII, and IX. The District Court ultimately took judicial notice of the fact that Spanish Peaks' lis pendens rendered title to Lot 84 unmarketable and instructed the jury accordingly.

¶57 On appeal, Spanish Peaks maintains the District Court erred because the privilege to file a lis pendens is broadly construed under *Paulson,* and because a judgment on its claims against West, if successful, would affect the title to or interest in Lot 84. Spanish Peaks maintains this argument is supported by its counterclaim and jury demand wherein it claimed as damages "lost business opportunities and revenues," as well as "such other and further relief as the Court deems just and appropriate." At a minimum, Spanish Peaks claims, West's interest in Lot 84 raised an issue of fact which should have precluded summary judgment.

¶58 Furthermore, Spanish Peaks disputes the propriety of the jury instruction given by the District Court on this issue. In particular, Spanish Peaks maintains that the conclusion that the lis pendens made the title to Lot 84 "unmarketable" was nothing more than a "thinly veiled legal conclusion," essentially directed the jury to accept, without any evidence, that Jediny was damaged by the lis pendens, and unduly restricted the jury to determining only an award of damages. In response, West argues that under *Paulson* the filing of a lis pendens requires that the underlying claim affect title or possession of real

23

property, and that this element was lacking here. Further, West maintains that the District Court properly instructed the jury on this issue. West argues that, by definition, a lis pendens renders title unmarketable, that the question of marketability of title is a question of law, and that M. R. Evid. 202 expressly allows for judicial notice of law.

¶59 Whether title is marketable is a question of law for the court. *Maloney v. Heer*, 257 Mont. 500, 507, 850 P.2d 957, 961 (1993). As we have stated previously, "marketable title is one of such character as assures to the purchaser the quiet and peaceable enjoyment of the property and one which is free from encumbrances." *First Mont. Title Co. of Billings v. North Point Square Assn.*, 240 Mont. 33, 37-38, 782 P.2d 376, 379 (1989) (quoting *Ogg v. Herman*, 71 Mont. 10, 15-16, 227 P. 476, 477 (1924)). While our case law has not squarely addressed this issue, we have implicitly recognized that a lis pendens casts a "cloud on title" which impairs the ability to sell the property to others. *See Public Lands Access Assn. v. Jones*, 2008 MT 12, ¶ 15, 341 Mont. 111, ¶ 15, 176 P.3d 1005, ¶ 15 (citing *Leisnoi, Inc. v. United States*, 170 F.3d 1188 (9th Cir. 1999)); *see also*, *Reilly v. Farm Credit Bank of Spokane*, 261 Mont. 532, 534, 863 P.2d 420, 422 (1993).

¶60 In *Paulson*, we held that § 70-19-102, MCA, "demands only that the action *affect* title or right of possession of real property." *Paulson*, 229 Mont. at 167, 745 P.2d at 361. In that case, we upheld the filing of a lis pendens against a parcel of property because the underlying action sought the imposition of limits upon the owner's right to construct a residence on his property. We held that such rights "are incidents of the owner's title. Although the present litigation does not seek to change ownership in any way, it does

24

involve a determination of certain rights incident to ownership and in that sense affects title to real property." *Paulson*, 229 Mont. at 168, 745 P.2d at 361 (quotation omitted).

¶61    Spanish Peaks argues that its claims affect the title to Lot 84 because it sought as damages "lost business opportunities and revenues," as well as "such other and further relief as the Court deems appropriate and just." However, this is an insufficient basis upon which to assert a lis pendens. *See* 54 C.J.S. Lis Pendens § 11, 508-09 (West 2005) (filing of lis pendens not appropriate in action for money damages or general debt unless claimant has actual lien or interest in subject property). Courts generally reject the notion that a lis pendens is appropriate in cases where no specific relief is sought which affects in some way the title, possession, use, or incidents of real property. "[A] lis pendens is not a tool for a litigant to secure a potential money judgment by tying up a debtor's real property." *Farris v. Advantage Capital Corp.*, 170 P.3d 250, 252 (Ariz. 2007); *Salstrom v. Starke*, 670 P.2d 809, 811 (Colo. App. 1983) (lis pendens improper when filing party had no interest in the property and filed the lis pendens solely to prevent sale of property to another party); *Lewis v. Super. Ct.*, 37 Cal. Rptr. 2d 63, 73 (Cal. App. 2 Dist 1994) (noting that lis pendens actions classically concern real property disputes and rejecting use of lis pendens when underlying actions seek only money damages).

¶62    While Spanish Peaks asserts that a general, boilerplate claim for damages renders the filing of a lis pendens proper simply because a property transfer gave rise to several of its counterclaims, the fact remains that none of its counterclaims sought to affect the possession of, title to, or any interest in, Lot 84. Thus, the District Court did not err in

holding that the filing of the lis pendens was improper, and granting summary judgment to West on Counts VI, VIII, and IX of its amended complaint.

¶63 Moreover, the District Court correctly instructed the jury on this issue. Spanish Peaks acknowledges that the question of marketability is a question of law for the court, but claims that the District Court erred in taking judicial notice that the lis pendens rendered Lot 84 unmarketable because M. R. Evid. 201 only allows judicial notice of facts. Yet, as West points out, M. R. Evid. 202 allows the District Court to take judicial notice of the law. As we stated in *In re K.C.H.*, 2003 MT 125, 316 Mont. 13, 68 P.3d 788, "Rule 202(b)(6), M. R. Evid., permits a court to take judicial notice of law, including the '[r]ecords of any court of this state . . . .' " *In re K.C.H.*, ¶ 15. The summary judgment order issued by Judge Holly Brown on July 31, 2006, wherein she determined as a matter of law that the filing of the lis pendens rendered Lot 84 unmarketable, constitutes such a court record. Although Judge John Brown took notice of Lot 84's unmarketable title as a question of fact under M. R. Evid. 201, as West points out, he should have taken judicial notice of Lot 84's unmarketable title as a matter of law under M. R. Evid. 202. Since the question of marketability of title to Lot 84 was determined as a legal matter by Judge Holly Brown in her grant of summary judgment, Judge John Brown was bound to instruct the jury accordingly. Thus, although the District Court employed the wrong reasoning, it reached the correct result and did not err. *State v. Case*, 2007 MT 161, ¶ 40, 338 Mont. 87, ¶ 40, 162 P.3d 849, ¶ 40.

¶64 **Issue Three:** *Did the District Court abuse its discretion by allowing the admission of the Separation Agreement?*

26

¶65    During trial, the District Court admitted the Separation Agreement into evidence over Spanish Peaks' objection. Spanish Peaks argues the admission of the Separation Agreement was an abuse of discretion, and that this evidence should have been excluded under M. R. Evid. 408 which prohibits the introduction of offers of compromise. Spanish Peaks notes that it filed several motions in limine to keep the Separation Agreement out of evidence and also sought a cautionary jury instruction, all of which were denied by the District Court.

¶66    West argues the admission of the Separation Agreement was not an abuse of discretion for several reasons. First, West asserts that before Rule 408 can apply, there must be a "dispute" between the parties and in this case there was no dispute when the Separation Agreement was presented to West, as there had been no prior discussions between him and Spanish Peaks on the issues covered in the Separation Agreement. Second, Rule 408 does not require the exclusion of an offer of compromise when offered for another purpose. In this case, the Separation Agreement was admitted in support of his theory that his firing was a pretext so that Spanish Peaks could avoid paying him outstanding trailing commissions. Moreover, West notes that the Separation Agreement was also introduced to rebut a claim by an executive from Spanish Peaks that West's shredding of documents was a key factor in his termination, and to also rebut Spanish Peaks' claim that West could still purchase Lot 85. Accordingly, West maintains that the Separation Agreement was admitted for "another purpose" under M. R. Evid. 408 and that the District Court did not abuse its discretion in admitting it.

¶67    M. R. Evid. 408 reads as follows:

**Rule 408. Compromise and offers to compromise.**
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. *This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.* (Emphasis added.)

¶68 As the last sentence of Rule 408 makes clear, offers of compromise are admissible when offered not to prove liability or invalidity of a claim or its amount, but rather for "another purpose." In *In re Estate of Stuckey*, 2004 MT 279, 323 Mont. 241, 100 P.3d 114, we upheld the admission of a letter which reflected "conduct or statements made in compromise negotiations" when the letter was being offered as evidence to demonstrate the assumptions under which parties were negotiating. *Stuckey*, ¶¶ 66-68. In *Kiely Const., L.L.C., v. City of Red Lodge*, 2002 MT 241, 312 Mont. 52, 57 P.3d 836, we upheld the admission of evidence from settlement negotiations because such evidence was not being offered to prove liability or the validity of a claim, but instead to prove that a municipal entity had acted arbitrarily and capriciously in attaching conditions to a subdivision improvement agreement. *Kiely*, ¶ 95; *see also Kaeding v. W. R. Grace & Co.—Conn.*, 1998 MT 160, ¶ 30, 289 Mont. 343, ¶ 30, 961 P.2d 1256, ¶ 30 (letter offered in the context of settlement negotiations admissible under Rule 408 because offered to show plaintiff's knowledge of his claim against W. R. Grace); *Kestell v. Heritage Health Care Corp.*, 259 Mont. 518, 528, 858 P.2d 3, 9 (1993) (proposed release form admissible

28

under Rule 408 because offered to show the employer did not intend to find employee another position).

¶69 In this case, the District Court stated clearly that it was allowing the Separation Agreement into evidence to support West's argument that his firing was pretextual. It was not offered in order to prove Spanish Peaks' liability or the invalidity of the claim. Thus, the District Court did not abuse its discretion in admitting it under Rule 408.

¶70 **Issue Four:** *Did the District Court abuse its discretion in imposing sanctions against Spanish Peaks by limiting its presentation of evidence and argument on the issue of damages for breach of the Employment Agreement?*

¶71 As noted above, Judge John Brown imposed sanctions against Spanish Peaks under M. R. Civ. P. 37. The sanctions imposed by the District Court prevented Spanish Peaks from disputing the figure of damages presented by West on his breach of contract claims in the event the jury determined that Spanish Peaks breached the Employment Agreement. As a result of this ruling, Spanish Peaks could only argue that damages were either zero or the $464,952.59 figure provided by West.

¶72 As noted above, Spanish Peaks had been ordered more than once to supply information in response to Interrogatory No. 10, by setting forth its calculation of what compensation would have been owed to West had he not been terminated. At trial, West complained that Spanish Peaks had failed to provide an actual figure of damages which he could challenge in presenting his case. In response, Spanish Peaks argued that it had provided all the information necessary to make the calculations, and that it could not provide an alternative figure other than zero, although it intimated that the jury might be able to arrive at a different damages figure based on the evidence before it.

29

¶73 The District Court concluded that if Spanish Peaks intended to present its own calculations to the jury, it should provide that information to West as requested. On the third day of trial, the District Court specifically instructed Spanish Peaks to provide an alternative figure to West by the following day. Spanish Peaks did not comply with this order. Therefore, the District Court imposed a sanction under Rule 37, limiting Spanish Peaks' ability to dispute the $464,952.59 figure presented by West.

¶74 We review the imposition of sanctions for an abuse of discretion and generally defer to the judgment of the district courts on the appropriateness of sanctions. *Richardson v. State*, 2006 MT 43, ¶ 21, 331 Mont. 231, ¶ 21, 130 P.3d 634, ¶ 21. Under the circumstances presented here, we cannot conclude that the District Court abused its discretion in imposing this sanction against Spanish Peaks.

¶75 **Issue Five:** *Did the District Court err in denying Spanish Peaks' motion for a directed verdict and post-trial motion for judgment as a matter of law on the claim that it breached an agreement to allow West to purchase Lot 85?*

¶76 On October 24, 2006, Spanish Peaks moved for a directed verdict on West's claim that it breached an agreement to allow West to purchase Lot 85. Spanish Peaks maintained that West had presented no evidence in its case-in-chief to support this claim. The District Court denied the motion. After trial, Spanish Peaks moved for judgment as a matter of law on this claim under M. R. Civ. P. 50. It argued that it could not have breached a contract to sell Lot 85 to West because Holdings, and not Spanish Peaks, was the actual party to the contract and West had never amended his complaint to include Holdings as a party-defendant.

¶77 In response, West pointed out that at trial, Spanish Peaks argued that a directed verdict was proper because West failed to present sufficient evidence; it did not argue, as it did post-trial, on the grounds that Holdings, not Spanish Peaks, was a party to the contract. West argued that the plain language of M. R. Civ. P. 50(b) requires that the renewed motion must be based on the same legal questions as the initial motion. Additionally, West argued that Spanish Peaks was improperly focusing its argument on the wrong contract. West alleged that the contract breached by Spanish Peaks was the Employment Agreement, which gave West the option to purchase a discount lot in the Spanish Peaks Resort, and not the actual purchase and sale agreement with Holdings.

¶78 The District Court denied Spanish Peaks' post-trial motion, finding that it was simply an attempt to use a "back door approach" to have it reconsider its earlier rulings preventing Spanish Peaks from arguing it was not a party to the contract. Moreover, the District Court found the jury's verdict was supported by sufficient evidence, that there was no substantial conflict in that evidence, and that the issue was properly submitted to the jury.

¶79 On appeal, Spanish Peaks argues that West and Jediny entered into a contract to purchase Lot 85 with Holdings, and that it was not party to that contract. In addition to other arguments, it also maintains that no evidence was adduced at trial which shows that it made any communications to West that he could not close on Lot 85, or that it took steps to prevent the sale.

¶80 In response, West argues that the Employment Agreement contained a separate promise to allow him to purchase Lot 85 which was not related to the contract between he

31

and Holdings, and that the jury properly found that Spanish Peaks breached it. West points to specific testimony from Spanish Peaks' executives to the effect that West could no longer purchase Lot 85 because he had been fired. Additionally, West points to other evidence in the record supporting the jury's verdict, including emails sent between Spanish Peaks' executives stating that West could not close on the sale of Lot 85 to West and that the deal to purchase Lot 85 was "off."

¶81 We review the denial of a motion for judgment as a matter of law de novo. *Marler*, ¶ 20. Here, the jury found that Spanish Peaks breached the contract which would allow West to purchase a lot at a discount. Prior to his termination, West had identified the lot and entered into a contract to purchase it with Holdings. West argued that Spanish Peaks breached the contract to allow him to purchase Lot 85. The jury agreed, and its decision was supported by credible evidence. Thus, the District Court did not err in allowing this issue to be submitted to the jury and denying Spanish Peaks' post-trial motion.

¶82 **Issue Six:** *Did the District Court abuse its discretion by limiting the testimony of Johnson on the custom in Montana of paying trailing commissions after an employee's termination?*

¶83 At trial, Spanish Peaks sought to introduce the testimony of Martha Johnson, a local real estate agent, on the custom and practice of paying trailing commissions in Montana on real estate transactions. West objected to her testimony on the grounds that she was giving undisclosed expert testimony, and not evidence based upon her personal knowledge as required under M. R. Evid. 701. Further, West argued that her testimony was irrelevant because she had no personal experience working for Spanish Peaks. The

32

District Court sustained West's objection and prohibited Johnson from testifying on this topic.

¶84 Spanish Peaks argues the District Court abused its discretion in prohibiting Johnson's testimony. Spanish Peaks insists that her testimony was relevant because it addressed West's claim that he was owed bonuses or commissions, and that an expert disclosure was not required in her case because Johnson would be giving lay testimony under M. R. Evid. 701. We disagree. As is clear from the record, Johnson's testimony was not based upon her personal experience working for Spanish Peaks, but instead upon her training and general experience working in the industry. In this regard, the facts of this case are distinguishable from the sole case upon which Spanish Peaks relies, *Mydlarz v. Palmer/Duncan Const. Co.*, 209 Mont. 325, 682 P.2d 695 (1984). In that case, we found that the district court improperly excluded the lay opinion of a former construction company employee who sought to give testimony on the safety of a workplace. *Mydlarz*, 209 Mont. at 343, 682 P.2d at 704-05. There, however, the witness had actually worked for the same company performing the same job as the injured claimant, and thus could give testimony about the safety of workplace conditions there based upon his actual perceptions as required under M. R. Evid. 701. *Mydlarz*, 209 Mont. at 343, 682 P.2d at 704-05. By contrast, Johnson had never worked for Spanish Peaks, and therefore her proposed testimony would be based not on personal knowledge, but rather industry standards. As such, her testimony should have been disclosed as M. R. Evid. 702 expert testimony. Because it was not, the District Court did not abuse its discretion in excluding the evidence.

33

¶85    **Issue Seven:** *Did the District Court err in ordering penalties in favor of West for Spanish Peaks' alleged violation of the Wage Act?*

¶86    After the jury returned a verdict in favor of West, finding that Spanish Peaks had breached the Employment Agreement, the District Court addressed the issue of whether West was entitled to penalties under the Wage Act. The District Court concluded that West was entitled to statutory penalties under § 39-3-204(1), MCA, which reads, in part, as follows:

> [E]very employer of labor in the state of Montana shall pay to each employee the wages earned by the employee in lawful money of the United States or checks on banks convertible into cash on demand at the full face value of the checks, and a person for whom labor has been performed may not withhold from any employee any wages earned or unpaid for a longer period than 10 business days after the wages are due and payable.

¶87    As noted by the District Court, § 39-3-206(1), MCA, provides for penalties against an employer "who fails to pay an employee as provided in this part or who violates any other provision of this part . . . ." The District Court concluded that the bonuses or trailing commissions which the jury determined Spanish Peaks owed to West were considered wages under the Wage Act, thus entitling West to a statutory penalty. The District Court distinguished *Delaware v. K-Decorators, Inc.*, 1999 MT 13, 293 Mont. 97, 973 P.2d 818, where we held that commissions which become "due" after an employee is terminated cannot be subject to statutory penalties under the Wage Act, on the grounds that *Delaware* interpreted a different section of the Wage Act, § 39-3-205(1), MCA. *Delaware*, ¶¶ 39-40. The District Court concluded penalties were warranted here

34

because West simply sought the penalty based on the wrongful withholding of his commissions under § 39-3-204(1), MCA.

¶88 Spanish Peaks maintains the District Court erred in its conclusion, and argues that its analysis of the Wage Act is incorrect. Spanish Peaks notes that the plain language of § 39-3-204, MCA, states that it applies to "employees," and not to former employees. Former employees, Spanish Peaks maintains, are covered under § 39-3-205(1), MCA, which states in part that: "[w]hen an employee separates from the employ of any employer, all the unpaid wages of the employee are due and payable on the next regular payday for the pay period during which the employee was separated from employment or 15 days from the date of separation from employment . . . ." Because we held in *Delaware* that this section of the Wage Act did not apply to future bonuses, Spanish Peaks argues that allowing West to recover would essentially overrule *Delaware* and would constitute a misreading and misapplication of §§ 39-3-204 and 205, MCA, of the Wage Act. We agree.

¶89 In construing and applying statutes, we first look to the plain language of the statute to determine legislative intent. *Delaware*, ¶ 30. "If the legislature's intent can be determined by the plain language of the words used, we may not go further and apply other means of interpretation." *Delaware*, ¶ 30. Moreover, "in construing a statute, 'the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.' " *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 115, 303 Mont. 274, ¶ 115, 16 P.3d 1002, ¶ 115 (quoting Section 1-2-101, MCA).

35

¶90    In this case, the District Court's construction and application of the statute is not supported by the plain language of the Wage Act. In the first instance we note that the term "employee," as used in the Wage Act, is specifically defined as follows: " 'Employee' includes any person who works for another for hire." Section 39-3-201(4), MCA. Thus, the Wage Act refers to persons who are actually working for an employer, not former employees. Section 39-3-204, MCA, states that an employer shall pay employees "wages earned" and that "a person for whom labor has been performed may not withhold from any employee any wages earned or unpaid for a longer period than 10 business days after the wages are due and payable." Based on the plain language of the statute, § 39-3-204, MCA, applies only to current, not former, employees.

¶91    As a result, we cannot say that § 39-3-204, MCA, covers West's claims for owed commissions in this case. Given that his commissions did not actually come due to West until he was no longer working for Spanish Peaks, these commissions, while certainly recoverable under his breach of contract claims, were not covered under § 39-3-204, MCA, of the Wage Act. West's trailing commissions became "due and payable" after the sales on those properties and/or built products closed. However, at the time these sales closed he was no longer an employee of Spanish Peaks. Thus, he was not covered under the Wage Act.

¶92    We hold that § 39-3-204, MCA, does not allow a former employee to recover a penalty under the Wage Act for wages unless those wages were "due and payable" while that person was still an employee. Thus, we reverse the District Court's grant of statutory penalties to West under the Wage Act.

36

¶93    **Issue Eight:** *Did the District Court abuse its discretion in ordering attorney's fees to West in the amount of $358,580.54?*

¶94    By an order dated February 22, 2007, the District Court awarded attorney's fees to West in the amount of $358,580.54 based on a 40% contingency fee arrangement between West and his attorneys. Spanish Peaks challenges the award of attorney's fees in several respects. First, Spanish Peaks argues that the District Court erred in awarding attorney's fees based on the contingent fee arrangement because the fee-shifting provision in the Employment Agreement stated that attorney's fees for a prevailing party were limited to "reasonable" fees "actually incurred." Spanish Peaks argues that the only fees "actually incurred" are those as reflected in hourly billing statements submitted by West's attorneys. Thus, only hourly fees, not the 40% contingent fee arrangement, are permitted under the Employee Agreement.

¶95    The District Court concluded that the Employment Agreement says nothing pertaining to either hourly or contingent fee agreements, and that the contingent fees were "actually incurred." We agree. Because the Employment Agreement was silent on this subject, and since both hourly and contingent fee arrangements are appropriate methods of billing, the District Court did not err in concluding that the contingent fees were the fees "actually incurred" under the fee-shifting provision in the Employment Agreement.

¶96    Spanish Peaks also argues it was improper for the District Court to award a contingent fee based on damages from Spanish Peaks' breach of the Employment Agreement allowing West to purchase Lot 85. However, as correctly noted by the District Court, it was proper to award fees based on these damages because the jury found

37

that Spanish Peaks breached the contract which would allow him to purchase Lot 85, and not the contract for sale between West and Holdings.

¶97     Spanish Peaks further argues that the District Court abused its discretion in applying the eight factors necessary to award attorney's fees as set forth in *Stimac v. State*, 248 Mont. 412, 812 P.2d 1246 (1991). Those factors are as follows:

1. The novelty and difficulty of the legal and factual issues involved;
2. The time and labor required to perform the legal service properly;
3. The character and importance of the litigation;
4. The result secured by the attorney;
5. The experience, skill, and reputation of the attorney;
6. The fees customarily charged for similar legal services at the time and place where the services were rendered;
7. The ability of the client to pay for the legal services rendered; and
8. The risk of no recovery.

*Stimac*, 248 Mont. at 417, 812 P.2d at 1249.

In particular, Spanish Peaks argues that the District Court erred in concluding that the case presented any "novel or difficult" legal issues under factor number (1). Spanish Peaks notes that West's own expert testified that there was not anything particularly novel about the case from a legal perspective. Second, Spanish Peaks argues that the District Court erroneously relied on factor (7) when in fact there was no competent evidence to support findings that West and Jediny could not pay attorney's fees. In this connection, Spanish Peaks points out that West and Jediny did not appear at an evidentiary hearing on fees, only submitted an affidavit, and generally provided no evidence to prove that they could not pay attorney's fees. Spanish Peaks relies on our opinion in *James Talcott Const., Inc. v. P & D Land Enterprises*, 2006 MT 188, 333 Mont. 107, 141 P.3d 1200, for the proposition that West bears the burden of proving that

an award of attorney's fees is based on "competent evidence." Third, Spanish Peaks argues that the District Court erred in its analysis of factor (8) under *Weinberg v. Farmers State Bank of Worden*, 231 Mont. 10, 752 P.2d 719 (1988), because there was no risk in this case due to the presence of the fee-shifting provision in the Employment Agreement.

¶98 Because the award of attorney's fees was calculated in part upon the award of statutory penalties under the Wage Act, the award of attorney's fees must be remanded to the District Court for recalculation. Nonetheless, we will address Spanish Peaks' remaining fee arguments in the interests of judicial efficiency.

¶99 With respect to its challenge under factor (8), we agree with the District Court that Spanish Peaks has simply misread our precedent in *Weinberg*. It is true that in *Weinberg* we stated that the "factor of risk which prompts courts to approve contingent fees . . . is not contemplated in those cases involving statutory or contractual provisions for attorney fees." *Weinberg*, 231 Mont. at 35-36, 752 P.2d at 735. However, we went on to say that "a contingent fee contract *does not bind* a district court in determining a proper amount of attorney fees to be awarded . . . ." *Weinberg*, 231 Mont. at 36, 752 P.2d at 735 (emphasis added). We did not say in *Weinberg* that fee-shifting provisions *prohibit* an award of contingent fees, as Spanish Peaks argues. Thus, the District Court did not err in concluding that factor (8) supported an award of fees based on the contingency agreement.

¶100 With regard to factor (1), novelty or difficulty of the case, Spanish Peaks focuses solely on the legal issues involved in the case, disregarding that factor (1) encompasses both legal and *factual* novelty or difficulty. The extensive and voluminous record in this

case, coupled with the fact that the trial lasted over ten days, demonstrates the factual complexities of this case, irrespective of whether the case presented novel legal issues of first impression. Thus, the District Court did not abuse its discretion in concluding this factor weighed in favor of an award of contingent fees.

¶101 Respecting factor (7), we agree with West that the affidavits submitted at the evidentiary hearing on fees were properly considered under M. R. Evid. 43(e) in light of the fact that Spanish Peaks did not object to their admission. The District Court stated in its order that "[t]he Plaintiffs . . . submitted sworn affidavits that they could not afford to pay the hourly fees, which exceeded $20,000.00 in some months and approached $100,000.00 for the two months surrounding trial. Spanish Peaks did not present evidence to contradict the Plaintiffs' Affidavits." On appeal, Spanish Peaks points to no evidence demonstrating that the factual findings in support of this conclusion were clearly erroneous or that the District Court committed an abuse of discretion in finding this factor weighed in favor of West.

## CONCLUSION

¶102 We affirm the District Court's orders of summary judgment determining that the Employment Agreement was ambiguous, and that the filing of the lis pendens was improper and not privileged. We also affirm the following District Court rulings during trial: (1) the admission of the Separation Agreement; (2) the sanctions against Spanish Peaks under M. R. Civ. P. 37 on the issue of damages; (3) the denial of Spanish Peaks' motion for judgment as a matter of law, as well as subsequent post-trial motions on West's claim for a breach of contract with respect to Lot 85; and (4) the District Court's

40

decision to prohibit Johnson from testifying on the practice and custom of paying trailing commissions in Montana. In sum, we affirm on Issues One through Six.

¶103 However, under Issue Seven we reverse the District Court's order granting West penalties for violation of § 39-3-204, MCA. We hold that § 39-3-204, MCA, does not allow an employee to recover a penalty under the Wage Act for wages unless those wages were "due and payable" while that person was still an employee—i.e., actually working for an employer. Additionally, we reverse the District Court's February 22, 2007 calculation of attorney's fees as discussed herein under Issue Eight, and remand this issue for further proceedings consistent with this Opinion.


                                        /S/ PATRICIA COTTER


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE